**UNITED STATES of America,**
**Plaintiff,**

v.

**Angela JOHNSON, Defendant.**

**No. CR 01–3046–MWB.**

United States District Court,
N.D. Iowa,
Central Division.

Feb. 18, 2005.

Alfred E. Willett, Terpstra, Epping & Willett, Cedar Rapids, IA, Dean A. Stowers, Rosenberg, Stowers & Morse, Des Moines, IA, Patrick J. Berrigan, Watson & Dameron, LLP, Kansas City, MO, Robert R. Rigg, Des Moines, IA, for Defendant.

Charles J. Williams, Patrick J. Reinert, U.S. Attorney's Office Northern District of Iowa, Cedar Rapids, IA, Thomas Henry Miller, Des Moines, IA, for Plaintiff.

## MEMORANDUM OPINION AND ORDER REGARDING THE PARTIES' SECOND ROUND OF PRETRIAL MOTIONS

BENNETT, Chief Judge.

### TABLE OF CONTENTS

I. *BACKGROUND* .......................................................1049
 A. *The Original And Superseding Indictments* ............................1049
 B. *The Co–Defendant's Trial* ..............................................1051
 C. *The Pretrial Motions In Johnson's Case* ...............................1052

II. *LEGAL ANALYSIS* ....................................................1053
 A. *The Government's Motion For Victim Witnesses To Be Present During Trial* ...........................................................1053
 1. *Arguments of the parties* .........................................1053
 2. *Analysis* .........................................................1054
 a. *Consideration of the government's supplemental argument* .......1054
 b. *Section 3510(b)* ...........................................1055
 c. *Section 3771* .............................................1055
 B. *The Government's Motion To Use Witness Photographs During Arguments* ............................................................1056
 1. *Arguments of the parties* .........................................1056
 2. *Analysis* .........................................................1058
 a. *Latitude and discretion* ...................................1058
 b. *"Summary" exhibits* ........................................1058
 c. *"Demonstrative" exhibits* ..................................1059
 d. *Use of the photographs here* ...............................1060
 C. *The Government's Motion To Determine Admissibility Of Audio Recordings* ...........................................................1063
 1. *Factual background* ...............................................1063
 2. *Arguments of the parties* .........................................1064
 3. *Analysis* .........................................................1065
 D. *Government's Motion Concerning The Number Of Peremptory Challenges* ............................................................1069

 1. *Arguments of the parties* ......................................... 1069
 2. *Analysis* .......................................................... 1071
E. *The Government's Motion For Court–Ordered Mental Examination Of*
 *The Defendant* .................................................... 1074
 1. *Background* ....................................................... 1074
 2. *Arguments of the parties* ......................................... 1075
 3. *Analysis* .......................................................... 1076
 *a. Rule 12.2* ..................................................... 1076
 *b. Rule 12.2(b): Defendant's notice*
 *i. Purpose of the provision* .................................. 1077
 *ii. The sufficiency of Johnson's notices* ...................... 1077
 *c. Rule 12.2(c)(1): Court-ordered examination* ................... 1081
 *i. The pertinent provision and its purpose* .................. 1081
 *ii. Johnson's request for an "outside taint team"* ............. 1082
 *iii. Johnson's demand for notice* ............................. 1085
 *iv. Johnson's demand for Fifth and Sixth Amendment*
 *protections* ............................................. 1085
 *v. Summary* .............................................. 1091
 *d. Rule 12.2(c)(2) & (3): Disclosure and use of results* .............. 1091
F. *The Defendant's Motion To Strike The Death Penalty* .................. 1092
 1. *Arguments of the parties* ......................................... 1092
 2. *Analysis* .......................................................... 1094
G. *The Defendant's Motion To Exclude Prior Jury Determinations As To*
 *Honken* .......................................................... 1094
 1. *Arguments of the parties* ......................................... 1095
 2. *Analysis* .......................................................... 1096
 *a. Honken's 1997 conviction* ..................................... 1096
 *b. Honken's 2004 conviction and verdict for a death sentence* ....... 1096
H. *The Defendant's Motion For A Bill Of Particulars* .................... 1097
 1. *Arguments of the parties* ......................................... 1097
 2. *Analysis* .......................................................... 1097
I. *The Defendant's Motion To Strike Certain Allegations In Counts 6*
 *Through 10* ....................................................... 1098
 1. *Arguments of the parties* ......................................... 1098
 2. *Analysis* .......................................................... 1098
J. *The Defendant's Motion To Trifurcate The Proceedings* ................. 1099
 1. *Arguments of the parties* ......................................... 1099
 *a. Written submissions* ......................................... 1099
 *b. Oral arguments* ............................................. 1100
 *c. Post–hearing inquiry* ........................................ 1102
 2. *Analysis* .......................................................... 1103
 *a. Constitutional requirements* ................................... 1103
 *b. Other grounds for "trifurcation"* ............................. 1104
 *i. Statutory limitations on the "information" presented at*
 *sentencing* ............................................. 1104
 *ii. "Probative value"* ......................................... 1105
 *iii. "Prejudice"* ............................................. 1106
 *iv. "Confusion of the issues"* ................................. 1109
 *v. "Misleading the jury"* ..................................... 1109
 *c. The remedy* ............................................... 1110

III. *CONCLUSION* .................................................... 1111

The court recently resolved a dozen pretrial motions in this federal death-penalty case, some of which required the court and the parties to explore terra incognita. *See* *United States v. Johnson,* 354 F.Supp2d 939 (N.D.Iowa 2005). Several more pretrial motions, filed subsequently, were

mooted by the government's voluntary dismissal of the two non-capital charges against this defendant. Nevertheless, this matter is now before the court on a "second," and hopefully "final," round of pretrial motions involving nearly as many, and nearly as varied, motions as the "first round." Some of the motions attempt to resolve, before trial, issues that arose during the separate trial of a co-defendant in a companion case, but others require the court and the parties to make further incursions into terra incognita.

## I. BACKGROUND

To provide the necessary background to the present group of pretrial motions, the court must once again review the charges and the key procedural history in this case against Angela Johnson and the separate case against co-defendant Dustin Honken. The court must also add certain important incidents in that history that have occurred since the court's ruling on the "first round" of motions. The review of the charges and procedural history begins with the two indictments filed against Johnson

### A. The Original And Superseding Indictments

In two separate indictments, a grand jury charged defendant Angela Johnson with a variety of offenses arising, principally, from her alleged involvement in the murders in 1993 of five witnesses to the drug-trafficking activities of Johnson's sometime boyfriend, Dustin Honken. The grand jury handed down the first seven-count indictment on July 26, 2000, and the second ten-count indictment on August 30, 2001. On April 25, 2002, the government filed its original notice in each case of its

intent to seek the death penalty on all of the charges against Johnson relating to the murder of witnesses, that is, Counts 1 through 5 of the first indictment and all ten of the charges in the second indictment. Those notices identified the factors that the government contends warrant the imposition of the death penalty under the applicable death-penalty statutes.

On August 23, 2002, the government filed superseding indictments in both cases against Johnson. The superseding indictment in the first case against Johnson, Case No. CR 00–3034–MWB, reiterated and expanded the seven counts of the original indictment. It charged the following offenses: five counts of aiding and abetting the murders of witnesses Gregory Nicholson, Lori Duncan (Nicholson's friend), Amber Duncan and Kandi Duncan (Lori Duncan's daughters, ages 6 and 10, respectively), and Terry DeGeus, respectively, in violation of 18 U.S.C. §§ 1512(a)(1)(A) and (C), 1512(a)(2)(A) or 1513(a)(1)(A) and (C),[1] 1111, and 2; one count of aiding and abetting the solicitation of the murders of witnesses Timothy Cutkomp and Daniel Cobeen, in violation of 18 U.S.C. §§ 373(a)(1) and 2; and one count of conspiracy to interfere with all seven witnesses, in violation of 18 U.S.C. § 371.

The August 23, 2002, superseding indictment in Case No. CR 01–3046–MWB, like the original indictment in that case, charged Johnson with five counts of killing witnesses while engaging in a drug-trafficking conspiracy ("conspiracy murder"), in violation of 21 U.S.C. § 848(e)(1)(A) and 18 U.S.C. § 2; and five counts of killing the same witnesses in furtherance of a continuing criminal enterprise ("CCE mur-

---

1. The court notes that there is no subdivision (C) to 18 U.S.C. § 1513(a)(1), nor does it appear that there ever has been. *See* 18 U.S.C.A. § 1513(a) & Historical and Statutory Notes. Notwithstanding this fact, Count 1 of the superseding indictment in Case No. CR

00–3034–MWB, which alleges that Johnson aided and abetted the killing of Gregory Nicholson, alleges that the killing was, *inter alia*, "in violation of Title 18, United States Code, Sections ... 1513(a)(1)(A) & (C)...." Superseding Indictment, Count 1.

der"), also in violation of 21 U.S.C. § 848(e)(1)(A) and 18 U.S.C. § 2. More specifically, Counts 1 through 5 of the superseding indictment in Case No. CR 01–3046–MWB charged that, on or about July 25, 1993, or in the case of Terry DeGeus, on or about November 5, 1993, while engaging in an offense punishable under 21 U.S.C. § 841(b)(1)(A) and 846, relating to a conspiracy to manufacture and distribute 100 grams or more of pure methamphetamine and 1000 grams or more of a mixture or substance containing a detectable amount of methamphetamine between 1992 and 2000, Angela Johnson intentionally killed and counselled, commanded, induced, procured, and caused and aided and abetted the intentional killing of Gregory Nicholson, Lori Duncan, Amber Duncan, Kandi Duncan, and Terry DeGeus, respectively, and that such killings resulted, all in violation of 21 U.S.C. § 848(e)(1)(A) and 18 U.S.C. § 2. Counts 6 through 10 of the superseding indictment charged that, on or about July 25, 1993, or in the case of Terry DeGeus, on or about November 5, 1993, while working in furtherance of a continuing criminal enterprise between 1992 and 2000 in violation of 21 U.S.C. § 848(c), Angela Johnson intentionally killed and counseled, commanded, induced, procured, and caused and aided and abetted the intentional killing of Gregory Nicholson, Lori Duncan, Amber Duncan, Kandi Duncan, and Terry DeGeus, respectively, and that such killings resulted, all in violation of 21 U.S.C. § 848(e)(1)(A) and 18 U.S.C. § 2.

On September 24, 2002, after the filing of the superseding indictments, the government filed a notice in Case No. CR 00–3034–MWB withdrawing its notice of intent to seek the death penalty for violations of the witness-tampering statute, 18 U.S.C. § 1512. However, the government reiterated its intention to continue pursuing the death penalty in Case No. CR 01–3046–MWB as to the "conspiracy murder"

and "CCE murder" charges pursuant to 21 U.S.C. § 848. Indeed, on November 14, 2002, the government filed a notice of intent to seek the death penalty on all ten charges in the superseding indictment in Case No. CR 01–3046–MWB.

Although the charges in the two indictments survived various challenges by Johnson, on November 15, 2004, the court granted the government's November 3, 2004, renewed motion in Case No. CR 00–3034–MWB to dismiss, without prejudice, counts 1–5 and portions of count 7 of the superseding indictment. The government's goal in seeking to dismiss the charges or parts of charges in question was to eliminate the need for two juries or two trials and to prevent possible error, in light of a ruling of the Eighth Circuit Court of Appeals on interlocutory appeals that certain evidence *is not* admissible as to the counts of Case No. CR 00–3034–MWB that involve the alleged murders of five witnesses, but *is* admissible as to charges that involve the alleged murders of the same witnesses in Case No. CR 01–3046–MWB. As a result of the partial dismissal of the first indictment, the charges in Case No. CR 00–3034–MWB consisted of one count of aiding and abetting the solicitation of the murders of witnesses Cutkomp and Cobeen, in violation of 18 U.S.C. §§ 373(a)(1) and 2, and one count of conspiracy to interfere with witnesses Cutkomp and Cobeen, in violation of 18 U.S.C. § 371, but the latter charge no longer related to the murders of the other five witnesses, Nicholson, the Duncans, and DeGeus.

On December 8, 2004, the government filed a Second Superseding Indictment in Case No. CR 01–3046–MWB, which essentially consolidated the remaining counts in the two separate cases into a single indictment. Thus, Counts 1 through 5 of the Second Superseding Indictment charge the

"conspiracy murders" of Nicholson, the Duncans, and DeGeus; Counts 6 through 10 charge the "CCE murders" of Nicholson, the Duncans, and DeGeus; new Count 11 charges aiding and abetting the solicitation of Dean Donaldson and Anthony Altimus to murder Timothy Cutkomp;[2] and new Count 12 charges conspiracy to solicit the murder of Daniel Cobeen, Timothy Cutkomp, and Special Agent John Graham.[3] On December 14, 2004, the government moved to dismiss the superseding indictment in Case No. CR 00–3034–MWB, because all charges against Johnson were then consolidated into a single charging document in Case No. CR 01–3046–MWB. Johnson concurred in the dismissal of that indictment on December 15, 2004. Therefore, on December 15, 2004, the court dismissed the superseding indictment in Case No. CR 00–3034–MWB, and denied as moot all motions pending it that case, leaving Case No. CR 01–3046–MWB as the only case against Johnson.

On January 11, 2005, the government moved to dismiss Counts 11 and 12 of the Second Superseding Indictment in Case No. CR 01–3046–MWB, stating that the government no longer had any intention of pursuing those charges. Johnson understandably concurred in the dismissal of those counts, because she had mounted several challenges to them. By order dated January 15, 2005, the court granted the government's motion to dismiss Counts 11 and 12 and also denied as moot several motions pertaining to those counts.[4] Thus, the only charges presently pending against Johnson are the charges of "conspiracy murder" in Counts 1 through 5 and the charges of "CCE murder" in Counts 6 through 10 of the Second Superseding Indictment in Case No. CR 01–3046–MWB.

### B. The Co–Defendant's Trial

On August 30, 2001, the Grand Jury also handed down an indictment in a companion case, Case No. CR 01–3047–MWB, charging Dustin Lee Honken with seventeen charges that were essentially identical to the charges in the original two indictments against Johnson. As in Johnson's case, the government sought the death penalty on the five counts of "conspiracy murder" and the five counts of "CCE murder." Honken's case proceeded to trial first.

In Honken's case, the government moved for an "anonymous" jury, and the court granted that motion. Therefore, jurors' names, addresses, and places of employment, and the names of spouses and their places of employment, were not disclosed to the parties, their counsel, or the public, either before or after selection of the jury panel. However, each juror's community of residence and the "nature" of his or her employment, and the "nature" of his or her spouse's employment, were

---

2. Thus, as compared to Count 6 of the superseding indictment in Case No. CR 00–3034–MWB, this count drops the portion of the charge alleging solicitation of Donaldson and Altimus to murder Daniel Cobeen.

3. This count also differs from Count 7 of the superseding indictment of Case No. CR 00–3034–MWB, in that it deletes the portions of that Count that charged conspiracy to solicit the murders of Nicholson, the Duncans, and DeGeus.

4. More specifically, the court concluded that dismissal of Counts 11 and 12 mooted the

following "second round" motions: (1) the defendant's December 23, 2004, Motion To Order Government To Elect Between Counts 11 And 12 (docket no. 252); (2) Johnson's December 23, 2004, Motion For Bill Of Particulars (docket no. 253) to the extent that it relates to Counts 11 and 12; (3) Johnson's December 23, 2004, Motion To Dismiss Counts 11 & 12 Of Second Superseding Indictment Due To Statute Of Limitations (docket no. 255); and (4) Johnson's January 5, 2005, Motion To Sever Counts 11 And 12 (docket no. 269).

disclosed to the parties, their counsel, and the public.[5]

Jury selection began in Honken's case on August 17, 2004, and continued over twelve days until a jury was empaneled on September 8, 2004. The "merits phase" of the trial began that day and continued, usually four days a week, until the issue of Honken's guilt or innocence was submitted to the jury on October 11, 2004. The jury returned a verdict on October 14, 2004, finding defendant Honken guilty of all seventeen charges. The "penalty phase" of Honken's trial commenced on October 18, 2004, and concluded on October 21, 2004, at which time the jury began its "penalty phase" deliberations. An issue of improper contacts with a juror arose during the "penalty phase" deliberations. Ultimately, on October 25, 2004, the court excused one juror and substituted an alternate juror. The jury was then instructed to begin its "penalty phase" deliberations anew. On October 27, 2004, the jury rendered its "penalty phase" verdict, finding that a sentence of life imprisonment should be imposed upon Honken for the murders of Greg Nicholson, Lori Duncan, and Terry DeGeus, but that a sentence of death should be imposed for the murders of Amber and Kandi Duncan. The jury contact issue and the verdicts, in both the "merits phase" and the "penalty phase," garnered considerable additional media coverage.

On December 16, 2004, the court heard evidence in support of post-trial motions in Honken's case. However, briefing and argument on those post-trial motions are not yet complete and the court has not yet issued any ruling on those motions.

### C. The Pretrial Motions In Johnson's Case

The court and the parties agreed to a deadline of January 7, 2005, for pretrial motions in this case. However, to expedite the orderly and timely resolution of pretrial motions, the court set an interim deadline of December 7, 2004, for a "first round" of pretrial motions, with the original deadline of January 7, 2005, for a "second round" of motions. At a hearing in this case on December 20, 2004, the court heard all pretrial motions that had been filed on or before December 7, 2004. The court entered an order resolving those motions on January 3, 2005.

As the court and the parties had anticipated, several more pretrial motions were filed on or before the "second round" deadline of January 7, 2005. More specifically, the motions now before the court are the following: (1) the defendant's December 8, 2004, Motion To Strike Death Penalty (docket no. 230); (2) the defendant's December 10, 2004, Motion In Limine Re: Prior Determinations Of Guilt And Punishment Re: Dustin Honken (docket no. 234); (3) the defendant's December 23, 2004, Motion For Bill Of Particulars On Counts 1–12 (docket no. 253), to the extent that the motion pertains to the remaining Counts, Counts 1 through 10; (4) the defendant's December 23, 2004, Motion To Strike Allegations Contained In Counts 6–10 (docket no. 254); (5) the government's December 29, 2004, Motion To Permit Victim Witnesses To Observe The Guilt Phase Of Trial (docket no. 258); (6) the government's December 29, 2004, Motion For Use Of Witness Photographs During Arguments (docket no. 259); (7) the government's December 29, 2004, Motion For Pretrial Ruling Regarding Admissibility Of Audio Recordings (docket no. 260); (8) the government's December 30, 2004, Motion For Equal Number Of Peremptory Challenges And Request For Pretrial Ruling (docket no. 261); (9) the government's Jan-

---

**5.** The court denied the government's motion for an anonymous jury in Johnson's case in its ruling on the "first round" of pretrial motions.

uary 6, 2005, Motion For A Court Ordered Mental Examination Of Defendant, And Related Matters (docket no. 270); and (10) the defendant's January 7, 2005, Motion To Trifurcate Proceedings (docket no. 274). All of the motions were duly resisted.

By order dated January 11, 2005, the court set a hearing for January 27, 2005, on all motions filed on or before January 7, 2005. At the hearing, the government was represented by Assistant United States Attorney C.J. Williams in Cedar Rapids, Iowa, and Assistant Iowa Attorney General Thomas Henry Miller in Des Moines, Iowa. Defendant Angela Johnson was personally present at the hearing and was represented by Alfred E. Willett of Terpstra, Epping & Willett in Cedar Rapids, Iowa; Dean A. Stowers of Rosenberg, Stowers & Morse in Des Moines, Iowa; and Patrick J. Berrigan of Watson & Dameron, L.L.P., in Kansas City, Missouri. Neither party requested the closure of any part of the hearing or the sealing of any part of the ruling on the "second round" of pretrial motions.

## II. LEGAL ANALYSIS

The court will address each of the pending motions in turn, although not necessarily in the order in which those motions were filed. Instead, the court will begin with the motions filed by the government, then turn to the motions filed by the defendant.

### A. The Government's Motion For Victim Witnesses To Be Present During Trial

The first motion the court will address is the government's December 29, 2004, Motion To Permit Victim Witnesses To Observe The Guilt Phase Of Trial (docket no. 258). In that motion, the government requests that the court allow all "victim witnesses" to be present during the "merits phase" of the trial, including "victim wit-

nesses" who may testify during the "merits phase." Johnson resisted this motion on January 7, 2005 (docket no. 273). The government filed a supplement to its motion on January 16, 2005 (docket no. 285), citing additional statutory authority for the presence of the "victim witnesses." Johnson filed no written response to the government's supplement, although she did respond at the hearing on January 27, 2005.

### 1. Arguments of the parties

The government contends that a number of family members of the murder victims are likely to testify in the "penalty phase" of this matter regarding the impact on their families of the offenses charged. The government contends, further, that some of the family members are also expected to testify during the "merits phase" concerning discrete factual events surrounding the disappearance of the murder victims and to identify certain clothing and other items recovered during various searches.

In its original motion, the government contended that, pursuant to 18 U.S.C. § 3510(b), "victim witnesses" cannot be excluded from any of the proceedings in this capital case. In her resistance, Johnson asserted that § 3510(b) is inapplicable to this prosecution pursuant to Title 21.

In its supplement, filed after Johnson's resistance, the government changed the basis for its motion. The government acknowledges that § 3510(b) is only directly applicable to capital prosecutions pursuant to Title 18. The government now asserts that, since filing its original motion, it has learned of provisions of the Justice For All Act of 2004, codified at 18 U.S.C. § 3771, which are applicable here. The government contends that several "victim witnesses," whom it now identifies by name and relationship to the alleged murder vic-

tims, fall within the statutory definition of "victims" in 18 U.S.C. § 3771(e). The government also asserts that § 3771(a)(3) expressly provides such "victims" with a right not to be excluded from the proceedings in this case, unless the court finds "by clear and convincing evidence" that the testimony of such "victims" would be "materially altered" by hearing other testimony. The government contends that Johnson cannot meet the heavy burden to show that the "victim witnesses" here will be so affected. The government also contends that the "victim witnesses" here are also excepted from the sequestration provisions of Rule 615, because they are authorized to be present at the proceedings by § 3771. Therefore, on the basis of different statutory authority, the government reiterates its request that "victim witnesses" be allowed to be present during the "merits phase" of the trial, even if they are likely to be witnesses in either the "merits phase" or the "penalty phase." At the hearing on January 27, 2005, the government added that there was little likelihood that any testimony during the "merits phase" or "penalty phase" of Johnson's trial could materially alter the testimony of the "victim witnesses," because the "victim witnesses" have heard essentially all of the evidence already, because they were present at all stages of Dustin Honken's trial.

At the hearing on January 27, 2005, Johnson acknowledged that the law has changed with the passage and effective date of 18 U.S.C. § 3771. Therefore, she offers no resistance to the government's motion to the extent that it relies on § 3771.

### 2. Analysis

#### a. Consideration of the government's supplemental argument

 The government's assertion of the Justice For All Act of 2004 as a basis for the relief it requests did not appear in its original motion or brief. Indeed, the government did not assert that basis for relief until after Johnson had already responded to the government's original motion. Thus, at first glance, the government's assertion of the Justice For All Act of 2004 as a basis for relief is a new argument presented for the first time in what appears to be a "reply brief." Ordinarily, inclusion of a new ground for relief in a reply brief is improper as a matter of motion practice in this court, see N.D. IA. L.R. 7.1(g); *Lorenzen v. GKN Armstrong Wheels, Inc.*, 345 F.Supp.2d 977, 992 n. 4 (N.D.Iowa 2004); *Baker v. John Morrell & Co.*, 263 F.Supp.2d 1161, 1169 n. 1 (N.D.Iowa 2003), and, indeed, in this circuit. *See Republican Party of Minn. v. Kelly*, 247 F.3d 854, 881 (8th Cir.2001) ("It is well established that issues not argued in an opening brief cannot be raised for the first time in a reply brief," citing *United States v. Vincent*, 167 F.3d 428, 432 (8th Cir.), *cert. denied*, 528 U.S. 848, 120 S.Ct. 124, 145 L.Ed.2d 105 (1999); *South Dakota Mining Ass'n v. Lawrence County*, 155 F.3d 1005, 1011 (8th Cir.1998); *United States v. Davis*, 52 F.3d 781, 783 (8th Cir.1995); *French v. Beard*, 993 F.2d 160, 161 (8th Cir.1993), *cert. denied*, 510 U.S. 1051, 114 S.Ct. 706, 126 L.Ed.2d 672 (1994)). However, in this case, the court finds that the government intended its "Supplemental Memorandum" to its motion as precisely that, a "supplement," rather than a "reply." Indeed, labeling the filing as a "Supplemental Memorandum" and filing it prior to the deadline expressly established by the court for responses to the "second round" of pretrial motions invited Johnson to respond to the additional arguments therein. Johnson has also had adequate time since the filing of the government's "Supplemental Memorandum" to file a response or to seek leave to do so, if she was in doubt about her ability to respond under the applicable

rules or the briefing schedule. Indeed, she conceded at the hearing on January 27, 2005, that the new authority cited by the government is controlling here and affords the relief that the government sought in its motion. Under these circumstances, the court deems it appropriate to consider the government's "supplemental" ground for relief as well as its original ground.

### b. Section 3510(b)

Johnson asserts, and the government all but concedes, that the authority on which it originally relied for relief, § 3510(b), is not *directly* applicable here. Section 3510(b) provides as follows:

> **(b) Capital cases.**—Notwithstanding any statute, rule, or other provision of law, a United States district court shall not order any victim of an offense excluded from the trial of a defendant accused of that offense because such victim may, during the sentencing hearing, testify as to the effect of the offense on the victim and the victim's family or as to any other factor for which notice is required under section 3593(a).

18 U.S.C. § 3510(b). Thus, § 3510(b) contemplates the testimony of "victim witnesses" about matters for which notice is required under § 3593(a). However, section 3593(a) is not at issue in this death-penalty prosecution pursuant to 21 U.S.C. § 848. The court finds that it need not consider the validity of the government's analogy between the applicable notice provision here, 21 U.S.C. § 848(h), and 18 U.S.C. § 3593(a), because there is, instead, another statutory provision that is directly applicable and dispositive of the government's motion.

### c. Section 3771

█ As the government suggests in its "Supplemental Memorandum," the provisions of the Justice For All Act of 2004, codified at 18 U.S.C. § 3771, are directly applicable here and do provide for the relief the government seeks. Section 3771 provides "crime victims" with certain rights during public court proceedings and parole proceedings involving the alleged perpetrator of a crime against them. *See* 18 U.S.C. § 3771. A "crime victim" is defined as "a person directly and proximately harmed as a result of the commission of a Federal offense or an offense in the District of Columbia." 18 U.S.C. § 3771(e). The statute provides, further, that "[i]n the case of a crime victim who is ... deceased, the legal guardians of the crime victim or the representatives of the crime victim's estate, family members, or any other persons appointed as suitable by the court, may assume the crime victim's rights under this chapter, but in no event shall the defendant be named as such guardian or representative." *Id.*

In this case, the government has identified the following "victim witnesses": Terry DeGeus's father, mother, sister, two brothers, ex-wife, and daughter; Lori Duncan's father, mother, brother, and sister, who are, respectively, Kandi and Amber Duncan's grandfather, grandmother, uncle, and aunt; Kandi and Amber Duncan's father, other grandfather, and other grandmother; and Greg Nicholson's ex-wife, who is the mother of his children, and two daughters. Johnson does not dispute, and the court expressly finds, that each of these persons is either "a person directly and proximately harmed as a result of the commission of" one or more of the federal offenses charged against Johnson, that is, the murders of Greg Nicholson, Lori Duncan, Kandi Duncan, Amber Duncan, or Terry DeGeus, or that, owing to the deaths of these alleged murder victims in this case, the murder victims' family members identified by the government are "representatives of the crime victim's estate" or "family members." Therefore, these per-

sons qualify for the rights afforded by § 3771.

Turning to those rights, 3771(a)(3) provides that a "crime victim" has "[t]he right *not to be excluded* from any such public court proceeding, *unless* the court, after receiving clear and convincing evidence, determines that testimony by the victim would be materially altered if the victim heard other testimony at that proceeding." 18 U.S.C. § 3771(a)(3) (emphasis added). The statute provides, further, that "[b]efore making a determination described in subsection (a)(3), the court shall make every effort to permit the fullest attendance possible by the victim and shall consider reasonable alternatives to the exclusion of the victim from the criminal proceeding. The reasons for any decision denying relief under this chapter shall be clearly stated on the record." 18 U.S.C. § 3771(b). Johnson has made no attempt to show that any of the testimony of any of the identified "victim witnesses" would be "materially altered" by hearing other testimony in this case. 18 U.S.C. § 3771(a)(3). Furthermore, as the government suggests, each of these witnesses appears likely to testify during the "merits phase" only as to discrete factual events surrounding the disappearance of the murder victims and to identify certain clothing and other items recovered during various searches, which are not matters susceptible to "material alteration" from hearing the testimony of other witnesses. Also as the government suggests, Rule 615 of the Federal Rules of Evidence does not require sequestration of these "victim witnesses," because those "victim witnesses" are "person[s] authorized by statute [§ 3771] to be present" during the proceedings. FED. R. EVID. 615.

Therefore, the government's December 29, 2004, Motion To Permit Victim Witnesses To Observe The Guilt Phase Of Trial (docket no. 258), as supplemented on January 16, 2005 (docket no. 285), will be granted.

### B. The Government's Motion To Use Witness Photographs During Arguments

The second motion the court will address is the government's December 29, 2004, Motion For Use Of Witness Photographs During Arguments (docket no. 259). In this motion, which anticipates an issue that arose during the trial of co-defendant Dustin Honken, the government seeks leave to mount 8.5″ × 11″ photographs of witnesses, as they appeared while testifying, on 5′ × 5′ boards to be displayed in the background in the courtroom during the government's closing arguments in the "merits" and "penalty" phases. The government also explains that its counsel may detach individual photographs to show the jury while referring to the testimony of particular witnesses. Johnson resisted this motion on January 7, 2005 (docket no. 272). At the hearing on January 27, 2005, the government added that it was exploring the feasibility of using Power Point or some kind of trial presentation software to show the witnesses' photographs. These and other methods for providing the jurors with photographs of the witnesses, including making court employees responsible for taking the photographs and providing them to the parties and the jurors, and whether such photographs should be available to the jurors during both trial and deliberations, were discussed in the course of the hearing and will be considered below.

### 1. Arguments of the parties

In support of this motion, the government contends that the parties are likely to call more than seventy-five witnesses in a trial likely to last more than three months. Consequently, the government contends that showing the jurors photo-

graphs of witnesses, as they appeared while testifying, will make it easier for jurors to recall the witnesses' testimony. The government also contends that showing the jurors the number of witnesses is a persuasive way of demonstrating to the jury the amount of evidence pointing to Johnson's guilt and the appropriateness of the death penalty for her crimes. The government argues, further, that use of such photographs falls within the wide latitude afforded parties in closing arguments. Finally, the government asserts that Johnson would also be entitled to use the photographs to refresh jurors' recollections of testimony and to argue, in opposition to the government's suggestions about the import of the number of witnesses, that the "quality" of evidence is more important than mere "quantity" of evidence.

Johnson, however, resists this motion. Johnson contends that the government's proposed use of the photographs to demonstrate the supposed "strength" of the evidence and the appropriateness of the death penalty is "inappropriate and inconsistent with the law." However, Johnson does not cite any applicable law on this point in her resistance, although in a subsequent paragraph she cites O'Malley, Federal Jury Practice and Instructions (5th ed. 2000) § 14.16, which might support her contention. Johnson's argument continues with the assertion that "[t]he trial of a defendant is not a numbers or pictures game," and that the court should so instruct the jury. To the extent that the court may nevertheless conclude that it is appropriate for the government to use the photographs of witnesses, Johnson contends that she should be afforded the same privilege.

At the hearing on January 27, 2005, the court proposed that any potential prejudice could be reduced by having a court employee, rather than a government or defense representative, take the witnesses' photographs and provide those photographs to both parties and jurors. The court asked the parties to consider the issue of whether or not a notebook of all of the witnesses' photographs could be provided to the jury as a demonstrative exhibit and the further issue of whether that notebook (or a notebook for each juror) could be provided to the jurors during their deliberations. Although the government generally concurred in the court's suggestion, Johnson registered some initial resistance to the idea of the jurors each receiving a notebook of witness photographs and to the idea of allowing jurors to have access to any such notebook or notebooks during their deliberations. Therefore, the court requested further briefing, initiated by the government, on these issues.

On January 28, 2005, the government filed a supplemental memorandum in support of its request to use witnesses' photographs during arguments. The government contends in its supplemental memorandum that the court has discretion to send "demonstrative" or "summary" exhibits to the jury during deliberations and that the photographs of witnesses are such demonstrative or summary exhibits, because they would aid the jury to understand and recall evidence already admitted, that is, the witnesses' testimony. The government also asserts that if the photographs are taken and compiled by court personnel, there is little chance that notebooks of witnesses' photographs will be taken as conveying any particular meaning to the jurors. Nevertheless, the government suggests a limiting instruction to advise the jurors that the photographs are provided to them only for the purpose of reminding them of the identity of the witnesses and their testimony, and explaining that a witness's testimony, not

his or her appearance, is the evidence that the jurors are to consider.

Johnson did not take advantage of the opportunity to file a supplemental brief on this issue.

### 2. Analysis

#### a. Latitude and discretion

 The government contends that its proposed use of the photographs of witnesses falls within the wide latitude parties should be afforded in making closing arguments. The government is correct that the district court "may properly grant counsel great latitude in making closing arguments." *United States v. Kindle*, 925 F.2d 272, 278 (8th Cir.1991) (citing *United States v. Felix*, 867 F.2d 1068, 1075 (8th Cir.1989), and *United States v. Lewis*, 759 F.2d 1316, 1350 (8th Cir.1985)). On the other hand, the Eighth Circuit Court of Appeals "afford[s] district courts wide latitude in controlling closing arguments." *United States v. Warfield*, 97 F.3d 1014, 1021 (8th Cir.1996) (citing *United States v. McGuire*, 45 F.3d 1177, 1189 (8th Cir.), *cert. denied sub nom. Mandacina v. United States*, 515 U.S. 1132, 115 S.Ct. 2558, 132 L.Ed.2d 811 (1995)). Thus, whatever latitude the government may have in closing arguments is limited by the court's discretion to control the closing arguments.

The government also contends that the photographs may be used during trial and sent to the jury, because they are either "summary" or "demonstrative" exhibits, even if they are not necessarily admissible. "[T]he trial judge is vested with discretion to determine whether exhibits shall be sent to the jury," *United States v. Lewis*, 759 F.2d 1316, 1329 n. 6 (8th Cir.1985), although it is the "general rule [that] exhibits should not be sent to the jury room which have not been admitted." *United States v. Warner*, 428 F.2d 730, 738 (8th Cir.1970). Thus, the court must determine whether or not the photographs of witnesses are "summary" or "demonstrative" exhibits, and if so, exercise its discretion to determine what use, if any, may be made of the photographs during the trial and deliberations.

#### b. "Summary" exhibits

 The government argues that the photographs of witnesses are "summary" exhibits, because they would aid the jury to understand and recall evidence already admitted, that is, the witnesses' testimony. Some time ago, in *United States v. Lewis*, 759 F.2d 1316 (8th Cir.1985), the Eighth Circuit Court of Appeals explained the nature of summary exhibits as follows:

> Summary exhibits are explicitly authorized by Fed.R.Evid. 1006; this Court has found them particularly useful to help triers of fact understand complex factual issues. *Boston Securities, Inc. v. United Bonding Ins. Co.*, 441 F.2d 1302, 1303 (8th Cir.1971). The charts or summaries and any assumptions that they include must be based upon evidence in the record. *United States v. Diez*, 515 F.2d 892, 905 (5th Cir.1975), *cert. denied*, 423 U.S. 1052, 96 S.Ct. 780, 46 L.Ed.2d 641 (1976).

*Lewis*, 759 F.2d at 1329 n. 6. Rule 1006, to which the court referred in *Lewis*, in turn provides as follows:

> The contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation. The originals, or duplicates, shall be made available for examination or copying, or both, by other parties at reasonable time and place. The court may order that they be produced in court.

FED. R. EVID. 1006. This court finds that the photographs of witnesses at issue here do not fit comfortably into the definition of "summary" exhibits in Rule 1006. The

witnesses' testimony, which the government contends the photographs merely "summarize," does not consist of "voluminous writings, recordings, or photographs," nor are the photographs of the witnesses the sort of "chart, summary, or calculation" that the rule appears to contemplate. *Id.* Thus, the court finds that Rule 1006, standing alone, is insufficient to support the use of photographs of witnesses during closing arguments or jury deliberations.

### c. "Demonstrative" exhibits

■ Although the court is not convinced that the photographs of witnesses are "summary" exhibits, the court readily finds that such photographs are "demonstrative" exhibits intended and likely to assist the jury in remembering the names and testimony of the witnesses. *Cf. United States v. De Peri,* 778 F.2d 963, 979 (3d Cir.1985) (a chart was a "demonstrative aid" because it helped the jury "remember the names and positions of the defendants").

The Rules of Evidence are silent on the use and admissibility of "demonstrative" exhibits. Nevertheless, the Eighth Circuit Court of Appeals has explained that district courts have "virtually unfettered discretion to regulate the use of ... non-evidentiary devices, either generally or to achieve procedural fairness and regularity in a particular case." *United States v. Crockett,* 49 F.3d 1357, 1362 (8th Cir.1995) (considering the use of transparencies to help jurors recall the testimony of witnesses). To structure that discretion, courts have used a balancing test, balancing probative value against potential prejudice, as Rule 403 provides, to determine whether "demonstrative" exhibits may be used *at trial. United States v. Fauls,* 65 F.3d 592, 596 (7th Cir.1995) (applying such a balancing test); *United States v. Gaskell,* 985 F.2d 1056, 1061 & n. 2 (11th Cir.1993) (same, also noting that "[s]everal circuits have recognized that demonstrative exhib-

its tend to leave a particularly potent image in the jurors' minds") (citations omitted). Similarly, some time ago, the Tenth Circuit Court of Appeals used a balancing of probative value and potential for unfair prejudice to determine whether demonstrative exhibits could be used *during deliberations,* as well as during trial. The court reiterated its prior holdings "that it is within the discretion of the Trial Court, absent abuse working to the clear prejudice of the defendant, to permit the display of demonstrative or illustrative exhibits admitted in evidence *both in the courtroom during trial and in the jury room during deliberations." United States v. Downen,* 496 F.2d 314, 320 (10th Cir.1974) (emphasis added) (citing *Taylor v. Reo Motors, Inc.,* 275 F.2d 699 (10th Cir.1960); *Ahern v. Webb,* 268 F.2d 45 (10th Cir.1959); *Millers' National Insurance Company, Chicago, Illinois v. Wichita Flour Mills Company,* 257 F.2d 93 (10th Cir.1958); *Carlson v. United States,* 187 F.2d 366 (10th Cir. 1951)). The court then held "that the submission of papers, documents or articles, *whether or not admitted in evidence,* to the jury *for view during trial or jury deliberations,* accompanied by careful cautionary instructions as to their use and limited significance, is within the discretion accorded the Trial Court in order that it may guide and assist the jury in understanding and judging the factual controversy." *Id.* at 321 (emphasis added).

In addition, if demonstrative exhibits are used at trial, courts have recognized the propriety of limiting instructions. *Crockett,* 49 F.3d at 1362 (the trial court's limiting instructions regarding demonstrative transparencies helped "to cure any undue influence the transparencies might have had"); *Downen,* 496 F.2d at 321 (the use of demonstrative exhibits is within the discretion of the court when, *inter alia,* the exhibits are "accompanied by careful cautionary instructions as to their use and

limited significance"). For example, courts may instruct that jurors should rely on their own recollections, not the demonstrative exhibit, *see Crockett*, 49 F.3d at 1362, and that such "demonstrative" exhibits are not "independent evidence," but instead are no better than the evidence on which they are based. *See, e.g., United States v. Bakke*, 942 F.2d 977, 985–86 (6th Cir.1991) (approving the district court's refusal to admit demonstrative exhibits into evidence and the district court's limiting instruction on the use the jury could make of such exhibits).

Because the court concludes that the photographs of the witnesses are "demonstrative" exhibits, the court must apply the balancing test explained above to determine what use, if any, may be made of the photographs during Johnson's trial and jury deliberations.

### d. Use of the photographs here

Balancing the "probative value" or "usefulness" of the photographs at issue here against their potential for unfair prejudice, *see Fauls*, 65 F.3d at 596; *Gaskell*, 985 F.2d at 1061; *see also Downen*, 496 F.2d at 321 (demonstrative exhibits are admissible in the court's discretion "absent abuse working to the clear prejudice of the defendant"), the court finds that showing the jurors photographs of witnesses at the end of a trial that is likely to last three months or more and likely to involve well over one hundred witnesses would be an effective way to refresh the jurors' memories as to the testimony of particular witnesses. Indeed, in addition to allowing the jurors to take notes, which the court will do, the photographs may be the only way to refresh jurors' memories about testimony of particular witnesses. Thus, as to the one side of the scales in the court's balancing process, use of photographs of witnesses is likely to be of substantial benefit to the jurors' understanding of the case.

Johnson, however, contends that she would be prejudiced by use of the photographs of witnesses by an improper suggestion that sheer numbers of witnesses should point the jury toward a particular result, specifically, a determination of guilt and imposition of the death penalty. Johnson is correct that determination of the truth of a matter is not merely "a numbers game." As Justice Black explained more than half a century ago,

> Our system of justice rests on the general assumption that the truth is not to be determined merely by the number of witnesses on each side of a controversy. In gauging the truth of conflicting evidence, a jury has no simple formulation of weights and measures upon which to rely. The touchstone is always credibility; the ultimate measure of testimonial worth is quality and not quantity. Triers of fact in our fact-finding tribunals are, with rare exceptions, free in the exercise of their honest judgment, to prefer the testimony of a single witness to that of many.

*Weiler v. United States*, 323 U.S. 606, 608, 65 S.Ct. 548, 89 L.Ed. 495 (1945). Nevertheless, some courts have recognized that, while the strength of evidence "does not necessarily depend upon the number of witnesses who testify, . . . the number is a legitimate consideration among other things, such as whether the single witness in opposition is an interested party." *See, e.g., Woodard v. Fanboy, L.L.C.*, 298 F.3d 1261, 1266 n. 6 (11th Cir.2002). Thus, there is some value to demonstrating the number of witnesses testifying as to certain matters as well as some potential for significant unfair prejudice in doing so.

The court concludes that the potential for unfair prejudice of displaying *all* of the photographs continuously during what is likely to be a very lengthy closing argument (in Honken's case, both the gov-

ernment's and the defendant's closing arguments were over three hours long) substantially outweighs the legitimate purposes for doing so. *See Weiler*, 323 U.S. at 608, 65 S.Ct. 548. This is so, because the impact of *seeing* the photographs of all of the witnesses in a single display is more substantial than the impact of recalling that there were numerous witnesses. *Cf. Gaskell*, 985 F.2d at 1061 n. 2 (noting that "[s]everal circuits have recognized that demonstrative exhibits tend to leave a particularly potent image in the jurors' minds") (citations omitted).[6] Again owing to the potency of such a visual display, the court also finds that this potential for unfair prejudice could persist, even if the jury is properly instructed on the issue of the "number" of witnesses.[7] Therefore, the court will not permit the government to display all of the witnesses' photographs in a single

---

6. The first photograph below is of the composite display, proffered by the government, of the photographs of all fifty-four witnesses called by the prosecution during the "merits phase" of Honken's trial. The court includes this photograph here to provide a sense of the impact of such a composite display. The photographs were mounted on three display boards, but individual photographs were mounted with velcro, so that they could be taken off the board and displayed to the jury separately, as shown in the second photograph below.

The court did not permit the government to use the full display of prosecution witnesses in Honken's trial, because the issue of its use arose at the eleventh hour, immediately before final arguments, neither the defense nor the court had previously been shown the display, the defense strenuously objected to use of the full display on the grounds of surprise and prejudice, and there was little time for the court to reflect on the matter. The court did, however, permit the government to use individual photographs of witnesses during its closing argument. In the present case, the government has taken the precaution of raising prior to trial the issue of proper use of photographs of witnesses during trial and arguments. Therefore, after a fuller opportunity to consider the question, the court will allow the government to make limited use of the full display, as explained in the body of this order.

7. In every case, this court has given the jury the following stock instruction, or something like it, on the weight of evidence, which is based in part on the quotation from *Weiler* above:

The weight of the evidence is not determined merely by the number of witnesses testifying as to the existence or non-existence of any fact. Also, the weight of the evidence is not determined merely by the number or volume of documents or exhibits. The weight of the evidence depends upon its quality, which means how convincing it is, and not merely upon its quantity. For example, you may choose to believe the testimony of one witness, if you find that witness to be convincing, even if a number of other witnesses contradict his or her testimony. The quality and weight of the evidence are for you to decide.

display for any significant period of time—certainly not for the full duration of a closing argument.

■ On the other hand, the court does not find the same sort of prejudice arising from a compilation of all of the witnesses' photographs in a notebook. To be sure, the notebook's increasing size will remind jurors of the number of witnesses, but the implication that a verdict should be reached on the basis of sheer numbers of witnesses is more remote than it would be from a panoramic display of the photographs of all of the witnesses. Moreover, the court finds that the potential for prejudice from such a compilation is likely to be considerably mitigated if the court itself is the source of the photographs and the notebook, and either party is free to use that notebook for demonstrative purposes—indeed, fairness dictates that both parties must have the same free access to a notebook provided by the court for demonstrative purposes. *Crockett,* 49 F.3d at 1362 (the court may "regulate the use of ... non-evidentiary devices ... to achieve procedural fairness and regularity in a particular case"). A limiting instruction regarding the proper use of the notebook would further mitigate any potential prejudice. *Id.* (the trial court's limiting instructions regarding demonstrative transparencies helped "to cure any undue influence the transparencies might have had"); *Bakke,* 942 F.2d at 985–86 (the potential prejudice of "demonstrative" exhibits was mitigated by an instruction that such exhibits were not "independent evidence," but instead were no better than the evidence on which they were based); *Downen,* 496 F.2d at 321 (the use of demonstrative exhibits is within the discretion of the court when, *inter alia,* the exhibits are "accompanied by careful cautionary instructions as to their use and limited significance"). Such an instruction would include a reminder that the testimony of the witnesses is evidence, but that the way witnesses appear in any photographs is not, *cf. Bakke,* 942 F.2d at 985–86 (noting that courts have recognized the propriety of instructing the jury that "demonstrative" exhibits are not "independent evidence," and are no better than the evidence on which they are based and approving the district court's limiting instruction to that effect); that the jurors should base their findings on their recollections of evidence, not on the appearance of witnesses in the photographs, *cf. Crockett,* 49 F.3d at 1362 (the trial court properly instructed jurors to base their findings on their recollection of the evidence, not on the transparencies showing the names and relationships of the defendants); and that a determination of the truth of a matter does not depend merely upon the number of witnesses testifying a certain way. *See Weiler,* 323 U.S. at 608, 65 S.Ct. 548.

In contrast, Johnson has not articulated any potential for unfair prejudice that would outweigh the probative value of refreshing jurors' memories about the testimony of *a particular witness* or *group of related witnesses* with photographs of those witnesses. The "numbers" argument does not apply to individual photographs and has less persuasiveness as to a group of photographs of related witnesses, and no other prejudice has been suggested. If any marginal prejudice could be asserted, the court again concludes that such prejudice would be sufficiently mitigated by the court, rather than a party, providing the witnesses' photographs and also providing an instruction that the witnesses' testimony, not their appearance or numbers, is the evidence before the jury.

Finally, in the present case, the court concludes that use of the photographs of

The court will also so instruct the jury in Johnson's case.

witnesses as demonstrative exhibits is permissible during *both* the trial and the jury's deliberations. *Downen*, 496 F.2d at 321. It is perhaps during deliberations that jurors would be most assisted in recalling the testimony of particular witnesses by having the opportunity to see photographs of those witnesses. At the same time, the measures the court has described to mitigate any potential prejudice would not lose their efficacy just because the jurors are out of the court's and the parties' sight.

Therefore, the government's December 29, 2004, Motion For Use Of Witness Photographs During Arguments (docket no. 259) will be granted on the following conditions: (1) A court employee will take a photograph of each witness, as the witness appeared while testifying, either before the witness's testimony has begun (as part of the "swearing in" process) or after the witness's testimony has concluded (as part of the process of dismissing the witness); (2) the photographs will be printed and compiled in a notebook; (3) either party may use the photographs of witnesses in the course of closing arguments, in the "merits phase" and/or the "penalty phase," if any, to refresh jurors' memories about the testimony of any witness or group of related witnesses;[8] (4) no party will be permitted to display more than one witness's photograph at any given time, unless that party has previously requested permission of the court to display simultaneously the photographs of a group of witnesses who testified on related matters and has shown the proposed display to opposing counsel; (5) no party may display all of the witnesses' photographs in a single display without prior permission of the court and may only present such a display

for a limited period of time, not for the full duration of a closing argument, although the length of time will be determined during a conference before closing arguments, when the court and the parties will be in a better position to estimate the duration of the arguments; and (6) unless a sufficient contrary showing is made upon the conclusion of all evidence in the "merits phase" of the trial, the notebook will be sent to the jury for the jury's use during deliberations.

### C. The Government's Motion To Determine Admissibility Of Audio Recordings

Next, the court turns to the government's December 29, 2004, Motion For Pretrial Ruling Regarding Admissibility Of Audio Recordings (docket no. 260), which also reprises an issue that arose in Honken's case. This motion, pursuant to Rule 104(c) of the Federal Rules of Evidence, seeks a ruling on the admissibility during the "merits phase" or "penalty phase" of this trial of separate audiotape recordings of meetings between Dustin Honken and two men, Greg Nicholson (one of the murder victims) and Timothy Cutkomp (a sometime co-conspirator), as well as audiotape and videotape recordings of conversations between Angela Johnson, Dwayne White (a cooperating witness), and Special Agent Michael Mittan. Johnson resisted the motion on January 7, 2005 (docket no. 271).

### 1. Factual background

The recording of the conversation between Honken and Nicholson was made after Nicholson agreed to cooperate with law enforcement officers in their investigation of Nicholson's and Honken's drug-

---

**8.** The court will not rule here on whether or not a party may also use the photographs of prior witnesses to refresh a subsequent witness's memory concerning a prior witness's identity or testimony. If any party wishes to make such use of the photographs, that party must first seek leave of the court to do so.

trafficking activities in 1993. The recording is of an incident on March 21, 1993, in which Nicholson delivered $3,000 in cash supplied by law enforcement officers to Honken, purportedly in payment for drugs. The conversation also includes a discussion of the possibility of Nicholson obtaining a kilogram of methamphetamine from Honken. Honken was arrested shortly after this conversation. The 1993 charges against Honken were dropped, largely because of the disappearance of the witnesses Honken has been convicted of killing and Johnson is charged with killing.

Honken and Cutkomp were arrested on new charges in 1996. While on pretrial release, Cutkomp agreed to cooperate with law enforcement officers and entered into a plea agreement indicating that he would do so. In May and June of 1996, Cutkomp met Honken while wearing a recording device and recorded his conversations with Honken.

The government has enhanced the recordings made by Nicholson and Cutkomp to reduce background noise and to make the recorded conversations more audible. However, the original tapes and enhanced tapes sent back to law enforcement officers in Iowa were inadvertently disposed of by a janitor and could not be found, despite an extensive search through the trash dump. The enhancement laboratory in Houston, Texas, had kept copies of the enhanced recordings as well as photographs of the original tapes. The government seeks leave to admit the enhanced copies at Johnson's trial.

The other recordings in question are audiotape and videotape recordings made in 1997 and 1998 of Angela Johnson's conversations with a cooperating witness and a law enforcement officer. The recordings consist of 14 conversations between Johnson and cooperating witness Dwayne White and Special Agent Mike Mittan of the Iowa Division of Narcotics Enforcement. Two the meetings were also videotaped. Two of the audiorecordings were enhanced because of excessive background noise.

The government asserts that it will present the testimony of one or more participants in each of the recorded conversations to the effect that the recordings accurately reflect the content of the conversations those participants had with either Honken or Johnson. The government also intends to play the recordings and to accompany them with transcripts.

### 2. Arguments of the parties

In support of this motion, the government argues that the recordings are admissible under the standards set forth in *United States v. McMillan*, 508 F.2d 101, 104 (8th Cir.1974). More specifically, the government argues that the devices used were capable of recording the conversations, not least because the recordings of the conversations plainly exist; the operators of the recording devices were competent, again largely because the recordings do, in fact, exist, and the operators will testify that they knew how to operate the equipment; the recordings are authentic and correct, because participants in the conversations will verify their accuracy; no changes, additions, or deletions have been made to the recordings, because officers will so testify, even though the recordings have been "enhanced" to make the conversations more audible; the recordings have been properly preserved, because there is no evidence to the contrary, and even the loss of some of the original recordings does not mean this requirement has not been satisfied, where enhanced copies of demonstrated authenticity are offered instead, and there is no evidence of bad faith in the loss of the originals; the speakers are identified, either by the government agents involved or

by acquaintances of the speakers who recognize the voices; and the conversations were recorded in good faith, without inducement to Honken or Johnson, who were merely given the opportunity to speak or respond. The government also contends that the recordings of Nicholson's and Cutkomp's conversations with Honken are admissible as co-conspirator statements.[9]

Johnson resists admission of the recordings in question, again in a resistance all but devoid of citation of any supporting authority. The essence of her resistance, reiterated at the hearing, is that the foundational and evidentiary issues are not so clear that the court can resolve them pretrial. She acknowledges that there may not be any issue with regard to enhancement of certain recordings, as long as the jury is told that it is hearing enhanced recordings. However, she contends that, if it becomes apparent that the recordings have been enhanced to the degree that the jury is not hearing a recording that fairly and accurately portrays the surrounding noises that the participants in the recorded conversations would have been hearing, then she may object on the ground that the enhanced tapes inaccurately portray the audibility of the participants' statements to each other at the time of the recordings. She also expresses her "doubts" that "enhancements" rather than "duplicates" can be admitted as "copies" of the originals, where the original tapes no longer exist.

Assuming that foundational objections can be overcome at trial, Johnson argues, that the recordings of conversations in

which she was not a party would still be inadmissible hearsay, because they do not satisfy any applicable hearsay exception or the requirements of the confrontation clause. She also argues that much of the recorded material is either not relevant or should be excluded pursuant to Rule 403 on the ground that any marginal relevance is outweighed by the potential for unfair prejudice, although she does not articulate what unfair prejudice would be at issue. Instead, she argues that the government's failure to provide the court with the tapes and transcripts means that the court cannot assess the admissibility of the recordings pretrial. Finally, Johnson argues that the recordings of conversations in which she participated are not relevant to any pending charges, but to the extent that they might be, they would tend to confuse the jury and are unfairly prejudicial, although she again fails to explain either the nature of the confusion or the potential for prejudice. She reiterates that, where the court does not have the recordings to review, the court cannot adequately determine the admissibility of the recordings.

## 3. Analysis

■ As the Eighth Circuit Court of Appeals recently reiterated, "The requirements for admitting tape-recorded information into evidence were set forth in *United States v. McMillan*, 508 F.2d 101, 103 (8th Cir.1974)." *United States v. Wells*, 347 F.3d 280, 288 (8th Cir.2003). In *McMillan* the Eighth Circuit Court of Appeals held as follows:

**9.** The government also invokes by reference its argument in a separate motion that Nicholson's statements are admissible pursuant to the "forfeiture by wrongdoing" exception to the hearsay rule in Rule 804(b)(6) and common law. The court has already ruled, in its ruling on the "first round" of pretrial motions, that the statements by Nicholson at

issue here are conditionally admissible pursuant to the "forfeiture by wrongdoing" exception under Rule 804(b)(6) and the common law, and pursuant to the procedures outlined in *United States v. Emery*, 186 F.3d 921 (8th Cir.1999), *cert. denied*, 528 U.S. 1130, 120 S.Ct. 968, 145 L.Ed.2d 839 (2000).

There must be a proper foundation for the introduction of the [recordings]. Those requirements include a showing: (1) That the recording device was capable of taking the conversation now offered in evidence; (2) That the operator of the device was competent to operate the device; (3) That the recording is authentic and correct; (4) That changes, additions or deletions have not been made in the recording; (5) That the recording has been preserved in a manner that is shown to the court; (6) That the speakers are identified; and (7) That the conversation elicited was made voluntarily and in good faith, without any kind of inducement.

*McMillan*, 508 F.2d at 103. Johnson does not appear to contend, as to any of the recordings that the government intends to offer in her case, that factors (1), (2), (6), or (7) are not satisfied. She does, however, resist a pretrial ruling on admissibility of the tapes on various "authenticity" grounds related to factors (3), (4), and (5), as well as relevance and hearsay grounds. The court agrees with Johnson that a final determination on the "*McMillan* factors" at issue cannot be made until the court is presented with both the recordings and evidence concerning the preservation and enhancement of the recordings.

However, the court can set the scene for determination of one issue, the question of the admissibility of "enhanced" copies when the original recordings are lost. The answer to this question breaks down into two separate inquiries: (1) What factors determine the necessary foundation for admissibility of "enhanced" recordings? and (2) Is an "enhanced" recording admissible when the "original" is lost? The court will consider these questions in turn.

In *United States v. Calderin–Rodriguez*, 244 F.3d 977 (8th Cir.2001), the Eighth Circuit Court of Appeals held that the "*McMillan* factors" apply to determination

of the authenticity and admissibility of a digitally enhanced recording:

> We see no distinction between the foundation required for the tape recorder and that for the digital enhancement program, which, from the point of view of a listener, simply improves the quality of the recording. If the capacity for digital enhancement were built into the tape recorder itself, rather than a separate step being required, the admissibility of the resulting tapes would clearly be governed by *McMillan*. There is nothing in the use of this separate device that should change our analysis.

*Calderin–Rodriguez*, 244 F.3d at 986. More specifically, the court applied the *McMillan* factors to the determination of the foundation for the "enhanced" recordings as follows:

> The first requirement of McMillan, "that the recording device was capable of taking the conversation now offered in evidence," *id.*, was amply satisfied in this case by testimony that Navarette had listened to the tapes before and after enhancement and he found the enhanced version to be "considerably more audible." *See United States v. McCowan*, 706 F.2d 863, 865 (8th Cir.1983) (*per curiam*) ("The very fact that the tape recordings exist establishes that the recording device was capable of picking up sounds and taking the conversation offered."); *United States v. Roach*, 28 F.3d 729, 733 (8th Cir.1994). Navarette's testimony that he had successfully used the software program about fifty times in the past also bolsters the conclusion that the program worked. The second requirement, that the operator of the device was competent to operate it, was satisfied by the same evidence. *See McCowan*, 706 F.2d at 865. ("Howard testified that he learned how to use the recorder on the day he made the tapes.

This fact, and the fact that Howard successfully made the tape recordings, satisfied the competency requirement of the second element of the *McMillan* test.") *The third and fourth McMillan requirements, that the recording is authentic and correct and that no changes, additions or deletions have been made, add a significant guarantee of trustworthiness. In this case, these requirements have been satisfied by the testimony of Officer Gardner, who listened to the original radio transmissions, that the tapes were accurate portrayals of the conversations. Although technically a "change" has been made by the digital enhancement, Navarette testified that it only changed the volume of sounds. Volume adjustment is commonly used in playing back recordings and is not legally significant.* There is no dispute about the remaining *McMillan* requirements. We therefore conclude that there was an adequate foundation for admission of the tapes.

*Id.* at 986–87 (emphasis added). Thus, while the foundation for "enhanced" recordings depends upon the same factors as the foundation for "original" recordings, and the technical "change" in volume of sounds is not legally significant, if that is the extent of the "enhancement" here, determination of whether an adequate foundation for admissibility of the "enhanced" recordings has been laid depends upon the government's ultimate showing of supporting evidence. The court will not rule on the admissibility of the tapes pretrial on the basis of the government's pretrial representations as to these matters.

The Federal Rules of Evidence govern the second part of the question, which is whether an "enhanced" recording is admissible in place of a lost "original." Rule 1001 defines both what is an "original" of a writing or recording and what is a "duplicate." *See* FED. R. EVID. 1001(3) ("original") & (4) ("duplicate"). Here, the "en-

hanced" recordings are "duplicates" to the extent that they are the result of "electronic re-recording." FED. R. EVID. 1001(4). As the Eighth Circuit Court of Appeals held in *Calderin–Rodriguez,* mere "changes" in volume in an "enhancement" are not legally significant. *Calderin–Rodriguez,* 244 F.3d at 986–87. Thus, to the extent that the "enhancement" involved here consists of only a volume change, the "enhanced" recordings likely qualify as "duplicates."

Although the "original" is ordinarily required to prove the contents of a recording, *see* FED. R. EVID. 1002, "duplicates" are "admissible to the same extent as an original unless (1) a genuine question is raised as to the authenticity of the original or (2) in the circumstances it would be unfair to admit the duplicate in lieu of the original." FED. R. EVID. 1003. Johnson has not yet raised a "genuine question" about the authenticity of the "original" recordings or an issue concerning the fairness of admitting the "enhanced" recordings in lieu of the lost "originals," but neither has the court been provided with the "original" or "enhanced" recordings or other evidence necessary to assess the authenticity of the "original" recordings.

The court finds instructive the following discussion by the Eleventh Circuit Court of Appeals of the use of a transcript in the place of an original recording, which had been destroyed by the Spanish National Police:

The absence of the audiotapes containing the original recorded statements is troublesome. Nonetheless, we differ with Appellant's contention that the court should have excluded the transcriptions of the telephone conversations that occurred in Spain on best evidence grounds. Federal Rule of Evidence 1002 provides that "[t]o prove the content of a writing, recording, or photo-

graph, the original writing, recording, or photograph is required, except as otherwise provided ... in these rules." The purpose of the best evidence rule is to prevent inaccuracy and fraud when attempting to prove the contents of a writing. Fed.R.Evid. 1001 advisory committee's note. However, where the original of a recording has been lost or destroyed, the original is not required and other evidence of its content is admissible, unless the proponent lost or destroyed the original in bad faith. Fed. R.Evid. 1004(1). Once the terms of Rule 1004 are satisfied, the party seeking to prove the contents of the recording—here, the government—may do so by any kind of secondary evidence. *See, e.g., United States v. Gerhart,* 538 F.2d 807, 809 (8th Cir.1976); Jack B. Weinstein & Margaret A. Berger, 5 Weinstein's Evidence § 1004[01], at 1004–4–1004–5 (1993). Finally, the party against whom the secondary evidence is being offered bears the burden of challenging its admissibility. *United States v. Garmany,* 762 F.2d 929, 938 (11th Cir.1985), *cert. denied,* 474 U.S. 1062, 106 S.Ct. 811, 88 L.Ed.2d 785 (1986).

Here, all of Rule 1004's requirements are met because the transcripts constituted "other evidence" of "the contents of ... recording[s]" that had been "lost or destroyed" through no fault of the government. *See* Fed.R.Evid. 1004(1). First, the prosecution was not at fault for the absence of the cassette tapes, which the Spanish National Police destroyed as part of routine procedure. Indeed, the prosecution never had any control of the tapes. Second, the transcripts constituted admissible best evidence because the transcripts were evidence of the contents of recordings, the misplaced or destroyed audiotapes. The two cases most directly on point—both involving transcripts of conversations recorded on audiotapes—support admis-

sion of the transcripts. In a negligence action, the Eighth Circuit held that where an original recording is missing, a transcript may be used to prove the content of the recording. *See Wright v. Farmers Co-op,* 681 F.2d 549, 553 (8th Cir.1982). In *United States v. Maxwell,* 383 F.2d 437 (2d Cir.1967), *cert. denied,* 389 U.S. 1043, 88 S.Ct. 786, 19 L.Ed.2d 835 and *cert. denied,* 389 U.S. 1057, 88 S.Ct. 809, 19 L.Ed.2d 856 (1968), with facts comparable to those of this case, the Second Circuit upheld the use of a transcript as secondary evidence where the recording from which the transcript derived had been accidentally erased and the drafter of the transcript testified to its accuracy. 383 F.2d at 442–43. Similarly, the transcripts here were admitted only after the original recordings could not be located due to standard procedures of the Spanish National Police, and the Spanish police officers who initially transcribed the recordings were cross-examined by Appellant's counsel. Moreover, we note that Appellant had ample opportunity to attack the transcripts' credibility before the jury. *See United States v. Howard,* 953 F.2d 610, 613 (11th Cir.1992) *(per curiam)* (suggesting that availability of monitoring agent at trial furthers purpose of best evidence rule to prevent fraud in proving contents of recordings because defendant may cross-examine agent's abilities and actions). Accordingly, the court properly admitted the transcripts into evidence.

*United States v. Ross,* 33 F.3d 1507, 1513–14 (11th Cir.1994) (footnotes omitted). In Johnson's case, this court finds no reason why an electronic "enhancement" should be any less acceptable as "secondary evidence" of the contents of lost recordings than a transcript, particularly where there appears to the court to be considerably less opportunity for "human error" to af-

fect the accuracy of an electronic "enhancement" than there is for "human error" to affect a transcript.

The key to admissibility of the enhanced recordings at issue here, however, may be Rules 1004 and 1008. As the government contends, Rule 1004(1) provides for the admissibility of "other evidence of the contents of a ... recording ... if ... [a]ll originals are lost or have been destroyed, unless the proponent lost or destroyed them in bad faith." FED. R. EVID. 1004(1). The government has made at least a *prima facie* showing of good faith in the loss of the original recordings in question and Johnson has not yet asserted any basis for a finding of bad faith, although she may attempt to do so at trial, when the recordings are actually available to the court and the circumstances of the loss of the recordings is fully explored. Ultimately, however, the court believes that the question of whether the contents of the "enhanced" recordings correctly reflect the contents of the lost "originals" will be a question for the jury pursuant to Rule 1008. That rule provides, in pertinent part, as follows:

> When the admissibility of other evidence of contents of ... recordings ... under these rules depends upon the fulfillment of a condition of fact, the question whether the condition has been fulfilled is ordinarily for the court to determine in accordance with the provisions of rule 104. However, when an issue is raised ... (c) whether other evidence of contents correctly reflects the contents, the issue is for the trier of fact to determine as in the case of other issues of fact.

FED. R. EVID. 1008. The court concludes that determination of whether or not the "*McMillan* factors" are satisfied, and whether or not the "enhanced" recordings are "duplicates" or adequate "secondary evidence" of the contents of lost recordings falls within the court's purview under Rule 1008, but none of these issues can be decided pretrial in the absence of the recordings themselves and evidence regarding them. On the other hand, also pursuant to Rule 1008, whether the "enhanced" recordings correctly reflect the contents of the lost originals is a matter for the jury. That determination, too, must await trial.

Because the court has reserved for trial the foundational questions presented, the court will likewise reserve the relevance and hearsay issues to which Johnson alludes. As to the latter issue, however, the court observes that the recordings may be conditionally admissible subject to either a "forfeiture by wrongdoing" or "co-conspirator" hearsay exception, as explained in its ruling on the "first round" of pretrial motions.

### D. Government's Motion Concerning The Number Of Peremptory Challenges

The government's penultimate motion now before the court is its December 30, 2004, Motion For Equal Number Of Peremptory Challenges And Request For Pretrial Ruling (docket no. 261). This motion responds to the court's suggestion during the hearing on the "first round" of pretrial motions that it might provide Johnson with additional peremptory challenges to counteract the effects of pretrial publicity, if the court ultimately denies Johnson's motion for change of venue, and the court's invitation for the government to respond to that suggestion. Johnson resisted the government's motion on January 7, 2005 (docket no. 276), also asserting, *inter alia*, that Rule 24(b) violates equal protection, because it provides the parties in a death-penalty case with equal numbers of peremptory challenges, but provides defendants in non-capital cases with more challenges than the prosecution.

#### 1. Arguments of the parties

In support of its motion, the government originally asserted that the court

does not have the authority to grant a single defendant additional peremptory challenges, particularly in a death-penalty case. At the hearing, however, the government conceded that the court probably has the discretion to grant a single defendant additional peremptory challenges, but that doing so would be contrary to the provisions of Rule 24(b). The government points out that Rule 24 of the Federal Rules of Criminal Procedure authorizes 20 peremptory challenges *for each side* in a death-penalty case. That rule, the government contends, provides the defense with additional peremptory challenges only when there are *multiple defendants*. The government argues that the granting of a limited exception indicates that no other exceptions are contemplated by the rule. The government also points out that the portion of the rule granting the parties the same number of peremptory challenges in a death-penalty case, when the defendant is granted more peremptory challenges than the government is granted in other non-capital felony cases, plainly indicates an intention that the parties in a capital case have the same number of peremptory challenges, and that such a difference is justified by the fact that capital cases are different.

Moreover, the government asserts that, in a case in which the Eighth Circuit Court of Appeals upheld a trial court's decision to grant additional peremptory challenges to counteract pretrial publicity, the trial court had granted *both* the defendant and the government the same number of additional peremptory challenges. *See United States v. Blom*, 242 F.3d 799, 804 (8th Cir.2001). The government represents that it has found no case in which only the defendant was granted additional peremptory challenges to counteract pretrial publicity. The government also suggests that the problem of pretrial publicity is most effectively and properly addressed in the parties' exercise of challenges for cause and

the court's rulings on those challenges. Therefore, the government requests that the court either adhere to the 20 peremptory challenges for both parties authorized by Rule 24 or, if the court increases the number of peremptory challenges owing to pretrial publicity, grant each party the same number of additional peremptory challenges.

In a response to the government's motion filed before the government dismissed Counts 11 and 12, Johnson contends that this case is both a capital and a non-capital case. Therefore, she contends that she is entitled to the 20 peremptory challenges for a capital case provided by Rule 24(b)(1) *and* the 10 peremptory challenges for a non-capital case provided in Rule 24(b)(2). She also contends that, particularly if venue is not changed, the court must craft a procedure that guarantees her constitutional right to a fair and impartial trial and that such a remedy would include granting her additional peremptory challenges. She believes that *Blom* is not to the contrary, because the pretrial publicity problem is one affecting her, not the government, not least because the government objects to a change of venue in her case. By opposing a change of venue, Johnson contends that the government has waived any argument that it should receive additional peremptory challenges. She also asserts that the court retains the discretion to grant the defendant more than the 20 peremptory challenges provided by Rule 24(b)(1), citing *Amsler v. United States*, 381 F.2d 37 (9th Cir.1967).

In addition, Johnson asserts an equal protection challenge to granting the government the same number of peremptory challenges, whether 20 or some other number. She contends that by granting the parties in capital cases equal numbers of peremptory challenges, but giving the defendants in non-capital cases more chal-

lenges than prosecutors, Rule ·24(b) violates equal protection. She asserts that the difference in the treatment of capital and non-capital defendants under the rule should be subject to "strict scrutiny," as the difference implicates a fundamental right to a fair and impartial trial. She contends, however, that the rule fails whatever level of scrutiny the court determines is applicable, notwithstanding contrary authority in *United States v. Tuck Chong,* 123 F.Supp.2d 559 (D.Haw.1999). She suggests that the remedy for the equal protection violation is to grant the government no more than 60% of the peremptory challenges granted to her.

### 2. *Analysis*

█ As the parties have noted, Rule 24 of the Federal Rules of Criminal Procedure provides that "[e]ach side has 20 peremptory challenges when the government seeks the death penalty." FED. R. CRIM. P. 24(b)(1). Because there are no non-capital charges remaining, the court need not entertain Johnson's argument that she is entitled to both the 20 peremptory challenges available in a death-penalty case, pursuant to Rule 24(b)(1), *and* an additional 10 peremptory challenges available in any "other felony case," pursuant to Rule 24(b)(2). Rule 24(b)(1) expressly authorizes the court to grant additional peremptory challenges only in multi-defendant cases, and only to the defendants. *See* FED. R. CRIM. P. 24(b). Thus, the question is whether the parties should have only the peremptory challenges authorized by Rule 24(b)(1) for a single-defendant capital case, or whether the court can and should author-

ize some larger number of strikes for one or both of the parties in this case.

The court finds some merit in the government's contention that Rule 24(b) expressly provides for additional peremptory challenges only in a multi-defendant case, so that additional peremptory challenges are not permitted in a single-defendant case. *See* FED. R. CRIM. P. 24(b). On the other hand, some time ago, at least two courts reviewed the *failure* of the trial court to grant an additional peremptory challenge to a single defendant in a criminal case only for abuse of discretion. *See United States v. Bentley,* 503 F.2d 957 (5th Cir.1974); *United States v. LePera,* 443 F.2d 810, 812 (9th Cir.), *cert. denied,* 404 U.S. 958, 92 S.Ct. 326, 30 L.Ed.2d 275 (1971).[10] Moreover, as the government acknowledges, and this court noted in its ruling on the "first round" of pretrial motions, the Eighth Circuit Court of Appeals has expressly recognized that increasing the number of peremptory challenges may be an appropriate means for the court to counteract the problems of pretrial publicity in a single-defendant case. *See United States v. Blom,* 242 F.3d 799, 804 (8th Cir.2001). Therefore, the court concludes that it does have the discretion to increase the number of peremptory challenges in a single-defendant capital case above the number stated in Rule 24(b)(1).

█ The question then becomes whether the court can increase the strikes allocated to only one party or must give both parties the same number of *additional* strikes. Again, there is some merit to the government's reading of Rule 24(b)(1) as

---

**10.** *Amsler v. United States,* 381 F.2d 37 (9th Cir.1967), on which Johnson relies for the court's discretion to grant more than 20 strikes, is not actually helpful to Johnson. That case involved multiple defendants, so that it fell under the express grant of authority to award additional peremptory challenges in Rule 24(b). *See Amsler,* 381 F.2d at 45

("The defendants ... should also have been allowed twenty peremptory challenges and such additional ones as the court in its discretion might allow.") (citing Rule 24(b)). Johnson's case is a single-defendant case and is distinguishable from *Amsler* on that ground alone.

expressing an intent to give both parties in a single-defendant capital case the same number of peremptory challenges, which suggests that the court should maintain an equal number of additional peremptory challenges for both parties, as well. The government is also correct that, in *Blom,* the court approved the district court's decision to address pretrial publicity, in part, by increasing the number of peremptory challenges *for each side. Blom,* 242 F.3d at 804. On the other hand, there is some merit to Johnson's contention that she is the party most burdened by pretrial publicity, not least because the government has objected to a change of venue on that ground. The court does not agree with Johnson, however, that the government has waived a right to an equal number of peremptory challenges by resisting a change of venue on the basis of pretrial publicity. This is so, because the government's resistance is not necessarily based on a view that the pretrial publicity does *not* burden the government. Rather, the government continues to assert in this case that, notwithstanding the pretrial publicity and the ensuing difficulty of picking an unbiased jury in this district, the citizens of this district have a right to see justice done in a trial in this district. Therefore, the court begins with a presumption, drawn from Rule 24(b) and *Blom,* that, if the court increases the peremptory challenges available to the parties in this single-defendant capital case, it should grant both parties the same number of additional peremptory challenges. That presumption has not yet been rebutted by any of Johnson's arguments considered above.

▆▆▆ Johnson contends, however, that granting the government the same number of peremptory challenges as the defendant in a capital case, pursuant to Rule 24(b)(1), violates her right to equal protection, where defendants in "other felony cases" are entitled to more strikes than the government, pursuant to Rule 24(b)(2). She

asserts, further, that "strict scrutiny" must be applied to this "equal protection" challenge. The court rejects Johnson's "equal protection" challenge.

First, as Johnson acknowledges, in *United States v. Tuck Chong,* 123 F.Supp.2d 559 (D.Haw.1999), the United States District Court for the District of Hawaii rejected precisely the same kind of "equal protection" challenge that she asserts here. In *Tuck,* the court concluded that "an equal protection analysis is not applicable" to peremptory challenges under Rule 24(b), because the rule does not differentiate among *defendants,* but among *offenses.* Consequently, the court concluded that "defendants charged with a capital offense and those charged with an offense punishable by imprisonment for more than one year or by fine or both, all receive the same number of peremptory challenges." *Tuck Chong,* 123 F.Supp.2d at 562. Next, the court concluded that, even if the statute differentiated between capital and noncapital defendants, the classification was not a suspect one, nor are peremptory challenges a fundamental right. Therefore, the court concluded that Rule 24(b) need only satisfy "rational basis scrutiny," rather than "strict scrutiny." *Id.* The court held that the rule satisfied "rational basis scrutiny." The court explained that "[c]apital defendants require different treatment with regard to peremptory challenges because it is necessary to draw a jury that is impartial not only to the particular defendant, but also [one that] can impartially weigh the evidence in determining whether a sentence of death is appropriate." The court also determined that granting both a capital defendant and the prosecution the same number of challenges, but granting non-capital defendants more challenges than the prosecution, served the legitimate government purpose of "obtain[ing] a jury that is able to impartially weigh the evidence in deter-

mining whether a death sentence is appropriate," but in a non-capital case, "death sentencing is not an issue; thus, a lower number of peremptory challenges for both sides is appropriate." *Id.* at 563.

Although this court does not find the analysis in *Tuck Chong* entirely satisfactory, this court does concur in the ultimate conclusion in that case. Specifically, this court is not convinced that Rule 24(b) distinguishes only between *offenses* rather than *defendants*. Even though all defendants in one category, either capital or non-capital, are granted the same number of peremptory challenges, it seems that the issue for "equal protection" purposes is why the defendants in the two *different* categories are given *different* "protection" in the form of different numbers, and different ratios, of peremptory challenges. The Advisory Committee provided no explanation of why Rule 24(b) authorizes the same number of peremptory strikes for each side in the trial of a capital defendant, but authorizes more for the defendant than for the prosecution in "other felony cases." Nevertheless, this court has found no case, and Johnson cites none, holding that capital defendants are a suspect class. Thus, one basis for "strict scrutiny" is unavailable. *See, e.g., City of New Orleans v. Dukes,* 427 U.S. 297, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976) *(per curiam)* ("Unless a classification trammels fundamental personal rights or is drawn upon inherently suspect distinctions such as race, religion, or alienage, our decisions presume the constitutionality of the statutory discriminations and require only that the classification challenged be rationally related to a legitimate state interest."). Therefore, unless another basis for "strict scrutiny" can be shown, this court agrees with the court in *Tuck Chong* that an "equal protection" challenge to Rule 24(b) of the sort presented here is only subject to "rational basis scrutiny." *See Tuck Chong,* 123 F.Supp.2d at 562.

Johnson does asserts that Rule 24(b) implicates her right to a fair and impartial jury, which she contends is a "fundamental right" entitling her to "strict scrutiny" of her "equal protection" challenge. *See Dukes,* 427 U.S. at 297, 96 S.Ct. 2513 (impingement on a fundamental right invokes strict scrutiny). There is no "constitutional" right to peremptory challenges, although the Supreme Court has held that such challenges constitute a "necessary part of trial by jury." *See Swain v. Alabama,* 380 U.S. 202, 219, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965); *accord Ross v. Oklahoma,* 487 U.S. 81, 88, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988) ("We have long recognized that peremptory challenges are not of constitutional dimension. They are a means to achieve the end of an impartial jury."). Thus, peremptory challenges are one means of attempting to ensure the defendant's "fundamental right" of a fair trial, but peremptory challenges do not, of themselves, have a constitutional status. Johnson does not explain, nor could she do so convincingly, how granting the parties the same number of peremptory challenges somehow undermines her right to a fair trial, such that the rule impinges on the fundamental right she has identified. Therefore, her conclusory assertion that "strict scrutiny" should apply here and her equally conclusory assertion that Rule 24(b) fails equal protection under the "strict scrutiny" standard (or any other standard) are both unconvincing.

Therefore, because Johnson's "equal protection" challenge is unavailing, and the presumption that the parties in a single-defendant capital case should have the same number of peremptory challenges has not been overcome, the government's December 30, 2004, Motion For Equal Number Of Peremptory Challenges And Request For Pretrial Ruling (docket no. 261) will be granted to the extent that, if the court determines that pretrial publicity

or other considerations warrant granting additional peremptory challenges beyond those expressly authorized by Rule 20(b)(1), the court will grant both parties the same number of additional peremptory challenges.

### E. The Government's Motion For Court–Ordered Mental Examination Of The Defendant

The last motion by the government currently before the court is the government's January 6, 2005, Motion For A Court Ordered Mental Examination Of Defendant, And Related Matters (docket no. 270). In this motion, the government seeks an order (1) requiring Johnson to submit to an examination by one or more government experts; (2) requiring her to provide the government with a supplemental notice identifying (a) the nature of any mental disease or defect upon which she has been interviewed, examined, or tested; (b) the kinds of mental health professionals who have interviewed, examined, or tested her; and (c) the specific nature of any testing that the defense experts have performed; and (3) continuing the deadline for the government to notify the defendant of any rebuttal experts it intends to use on this issue until ten days after Johnson provides a meaningful supplemental notice. Johnson responded to this motion on January 18, 2005 (docket no. 294), resisting only the second item of relief sought by the government.

### 1. Background

In its motion, the government explains that on December 20, 2004, Johnson provided the lead prosecutor with a handwritten notice pursuant to Rule 12.2(b) of the Federal Rules of Criminal Procedure, the body of which states the following:

> U.S. v. Angela Johnson
> Defense Mental Health Experts: Penalty Phase

> Dr. William S. Logan, M.D. (psychiatrist)
> Dr. Michael Gelbort, Ph.D. (nueropsychologist [sic])
> Dr. Marilyn Hutchinson, Ph.D. (psychologist)
> Dr. Logan and Dr. Hutchinson are in Kansas City. Dr. Gelbort works in Chicago.

Government's Motion For A Court Ordered Mental Examination Of Defendant, And Related Matters (docket no. 270), Exhibit 1. The government represents that, along with this handwritten notice, Johnson's counsel stated that Johnson had been interviewed by one or more of these experts, but that no "testing" had occurred to date.

Subsequently, on January 3, 2005, Johnson filed a Defense Designation Of Expert Witnesses, which states the following:

> The defense designates the following as expert witnesses, all of whom, pending budgetary approval, are expected to testify in the penalty phase of Ms. Johnson's trial on issues regarding her mental health:

> Dr. Marilyn Hutchinson, Ph.D. Kansas City, Missouri
> Dr. Michael Gelbort, Ph.D. Chicago, Illinois
> Dr. William S. Logan, M.D. Kansas City, Missouri
> Dr. Mark D. Cunningham, Ph.D. Lewisville, Texas
> Dr. Cunningham may also testify regarding issues of prison security and future dangerousness.

Defense Designation of Expert Witnesses (docket no. 265). Dr. Cunningham previously testified as a mental health expert witness in the separate trial of Johnson's co-defendant, Dustin Honken.

## 2. Arguments of the parties

In support of its motion for mental examination of the defendant, the government argues, first, that the court should order a mental examination pursuant to Rule 12.2, so that the government will have the opportunity for effective rebuttal of any mental condition defense during the "penalty phase." The government asserts that, to comply with the requirements of Rule 12.2(b)(2), the government will create a "taint team" in the prosecutor's office to work with the government's expert or experts to coordinate examinations and to ensure that the results and reports are sealed in whatever manner the court instructs.

The government also argues that Johnson's notice of intent to rely on expert mental condition testimony is inadequate for the government to conduct any meaningful examination of Johnson or even to identify the appropriate expert or experts that the government may need to retain. The government contends that a supplemental notice must include at least the kinds of mental health experts Johnson is using and the nature of the mental disease or defect for which Johnson has been or will be examined, interviewed, or tested, if the government is to respond to testimony that may be based on some of those diagnostic techniques, but not others. Because Johnson's notice is inadequate, the government asserts that it needs additional time to respond until after an adequate notice is provided.

In response, Johnson identifies both "areas of accommodation" and "areas of dispute." Specifically, she does not object to the government's request that she submit to a mental examination by government experts, although she reserves the right to contest details, and she does not object to

an extension of the government's deadline until after the defense supplements its notice, but not later than January 31, 2005. On the other hand, she strenuously disagrees with the government's assertion that it is entitled to have the findings and results of the defense's mental health experts' examinations or evaluations before the government is able to choose its own expert to examine Johnson. The government's assertion that it is unable to guess which expert to hire without a diagnosis from the defense experts, Johnson contends, is "exaggerated hype, unsupported by case law, and refuted by the express language of Rule 12.2(c)(2)."[11]

As to disputed issues, Johnson contends that any "taint team" established by the government to deal with mental health experts should not be in the same office as the prosecutors. She points out that there are already two "taint teams" in the United States Attorney's Office for the Northern District of Iowa for other matters in this case, and that is enough. Although she presumes the good faith and integrity of everyone involved, she suggests that an inadvertent breakdown in the "firewall" between the "taint team" and prosecutors could be disastrous. Once a "firewall" is created, Johnson states that she will immediately provide the "taint team" with the kinds of mental health professionals she has retained as experts (for example, "forensic psychiatrist," "neurologist," "clinical psychologist," etc.), as well as the specific nature of any testing that these experts have performed or will perform (such as the MMPI–2, the WAIS–2, etc.) in the course of evaluating her. In return, she requests five days advance notice of any testing that the government experts intend to administer in order to have an

11. She also suggests that the delay in her own work in this area results from the failure of the circuit to act upon her funding request.

opportunity to object to a particular test or procedure. Johnson wishes to preserve both her right to challenge the validity of specific tests for persons in her circumstances and her right to consult with counsel during any evaluation by a government expert.

Although she is willing to disclose the kinds of mental health professionals she has retained and the kinds of tests that they have performed or will perform, Johnson contends that, pursuant to Rule 12.2(c)(3), the government is not entitled to know the nature of the mental disease or defect for which she was examined, interviewed, or tested until *after* disclosure of the results and reports of the government's experts, but the government is attempting to turn that requirement on its head. She contends that the "nature" of the proffered mental condition is essentially the same as the "results and reports" for which early disclosure is barred. Thus, she contends that disclosure of the types of mental health experts and the particular tests they will employ is sufficient to enable the government to hire the right type of rebuttal experts and to conduct the proper tests.

Johnson also contends that, if the government is permitted to examine her, then she should be allowed to have present a representative of the defense, which may include a defense expert, during any clinical interviews and/or testing. She contends that the law is clear that a psychiatric interview is a critical phase of the criminal process during which she has a right to counsel. She also contends that she has a Fifth Amendment right against self-incrimination during any such examination, even if she subsequently waives such privilege to the extent that she puts her mental condition at issue before the jury. Where the waiver is not unlimited, she asserts that she is entitled to guidance of counsel, and that counsel has an ethical,

and perhaps constitutional, obligation to be present. Although she acknowledges a split in authority as to whether the right to counsel attaches at a government mental health examination, she contends that the court should, in its discretion, err on the side of protecting that right.

### 3. Analysis

#### a. Rule 12.2

 Rule 12.2 of the Federal Rules of Criminal Procedure was amended in 2002, in large part, to address situations, such as the one presented here, in which a defendant indicates an intent to present expert evidence of her mental condition during capital sentencing proceedings. Indeed, of the five substantive changes in the 2002 amendments identified by the Advisory Committee, the following four apply to the situation here: (1) "the defendant is required to give notice of an intent to present expert evidence of the defendant's mental condition during a capital sentencing proceeding"; (2) "the amendment addresses the ability of the trial court to order a mental examination for a defendant who has given notice of an intent to present evidence of mental condition during capital sentencing proceedings and when the results of that examination may be disclosed"; (3) "the amendment addresses the timing of disclosure of the results and reports of the defendant's expert examination"; and (4) "the amendment extends the sanctions for failure to comply with the rule's requirements to the punishment phase of a capital case." FED. R. CRIM. P. 12.2, Advisory Committee Notes, 2002 Amendments.

A full statement of the pertinent portions of Rule 12.2 provides an overview of the scheme for mental health examinations and disclosure of results. As amended in 2002, Rule 12.2 provides, in pertinent part, as follows:

**(b) Notice of Expert Evidence of a Mental Condition.** If a defendant intends to introduce expert evidence relating to a mental disease or defect or any other mental condition of the defendant bearing on ... (2) the issue of punishment in a capital case, the defendant must—within the time provided for filing a pretrial motion or at any later time the court sets—notify an attorney for the government in writing of this intention and file a copy of the notice with the clerk. . . .

**(c) Mental Examination.**

**(1) Authority to Order an Examination; Procedures. . . .**

**(B)** . . . . If the defendant provides notice under Rule 12.2(b) the court may, upon the government's motion, order the defendant to be examined under procedures ordered by the court.

**(2) Disclosing Results and Reports of Capital Sentencing Examination.** The results and reports of any examination conducted solely under Rule 12.2(c)(1) after notice under Rule 12.2(b)(2) must be sealed and must not be disclosed to any attorney for the government or the defendant unless the defendant is found guilty of one or more capital crimes and the defendant confirms an intent to offer during sentencing proceedings expert evidence on mental condition.

**(3) Disclosing Results and Reports of the Defendant's Expert Examination.** After disclosure under Rule 12.2(c)(2) of the results and reports of the government's examination, the defendant must disclose to the government the results and reports of any examination on mental condition conducted by the defendant's expert about which the defendant intends to introduce expert evidence.

**(4) Inadmissibility of a Defendant's Statements.** No statement made by a defendant in the course of any examination conducted under this rule (whether conducted with or without the defendant's consent), no testimony by the expert based on the statement, and no other fruits of the statement may be admitted into evidence against the defendant in any criminal proceeding except on an issue regarding mental condition on which the defendant:

\* \* \* \* \* \*

**(B)** has introduced expert evidence in a capital sentencing proceeding requiring notice under Rule 12.2(b)(2).

FED. R. CRIM. P. 12.2(b)-(c). Analysis of Johnson's motion, however, requires the court to parse the pertinent sections of the Rule in turn to determine their effect in this case.

**b. Rule 12.2(b): Defendant's notice**

**i. Purpose of the provision.** As the Advisory Committee explained, the amended "notice" provision in 12.2(b), set out in pertinent part above, "adopts the view" that "the better practice is to require pretrial notice of th[e] intent [to offer expert evidence on the defendant's mental condition] so that any mental examinations can be conducted without unnecessarily delaying capital sentencing proceedings." *Id.*, Advisory Committee Comments, 2002 Amendments. Unfortunately, the rule provides little definition of the required content of the defendant's notice.

**ii. The sufficiency of Johnson's notices.** The government contends that Johnson's handwritten and filed notices of experts are both inadequate for the government to prepare to respond to Johnson's mental condition evidence. Specifically, the government requests that Johnson be compelled to disclose the kinds of mental health experts she is us-

ing (which the court finds that she has done, in the handwritten notice quoted above, as to all of her experts except Dr. Cunningham, who testified at Honken's trial) and the nature of the mental disease or defect for which Johnson has been or will be examined, interviewed, or tested (which Johnson clearly has not done). Johnson contends that the government is improperly seeking the findings and results of the defense's mental health experts' examinations or evaluations before the government chooses its own experts to examine Johnson.

A similar issue arose in *United States v. Sampson*, 335 F.Supp.2d 166 (D.Mass. 2004), one of the few cases identified by the court and the parties that has applied newly-amended Rule 12.2 to circumstances similar to those presented here, and the only one to address this precise issue. In *Sampson*, the defendant provided a notice that merely parroted the language of Rule 12.2, stating that " 'he may introduce, at the penalty phase of this capital case, expert evidence relating to a mental disease or defect or any other mental condition bearing on the issue of punishment.' " *Sampson*, 335 F.Supp.2d at 241 (quoting the defendant's notice); *and compare* FED. R. CRIM. P. 12.2(b)(2) (the defendant must give notice if he or she "intends to introduce expert evidence relating to a mental disease or defect or any other mental condition of the defendant bearing on . . . (2) the issue of punishment in a capital case."). The government challenged the sufficiency of the content of this notice, asking the court to order Sampson to disclose as well "(1) the nature of the proffered mental condition(s); (2) the identity and qualifications of the expert who would testify or whose opinions would be relied upon; (3) a brief, general summary of the topics to be addressed that was sufficient to permit the government to determine the area(s) in which its expert(s) must be versed; and (4) all medical records and test results relat-

ing to mental health that would be the subject of the anticipated expert testimony." *Id.* at 242. The defendant, however, "objected to providing more information than Rule 12.2 explicitly required." *Id.*

In *Sampson*, the court adopted the parties' agreement that the defendant would supplement his notice to include " 'the kinds of mental health professionals who have evaluated Mr. Sampson (e.g., forensic psychiatrist, neuropsychologist, clinical psychologist) as well as the specific nature of any testing that these experts have performed (e.g., MMPI–2, WAIS–2, etc.) in the course of their evaluations of Mr. Sampson.' " *Id.* (quoting the parties' agreement). Similarly, here, Johnson has unilaterally offered to provide the following information to supplement her notice, once a "firewall" is in place in the United States Attorney's Office: "the kinds of mental health professionals each of her four experts [is] (e.g., 'forensic psychiatrist', 'neurologist', 'clinical psychologist', etc.), as well as the specific nature of any testing that these experts have or will perform (e.g., MMPI–2, WAIS–2, etc.) in the course of their evaluation of Ms. Johnson." Defendant's Brief in Support of Defendant's Resistance, In Part, To Government's Motion For A Court Ordered Mental Examination Of Angela Johnson, 3. Johnson has, in fact, provided some of this information, by identifying the "kind" of mental health professional three of her four mental health professionals are in her handwritten notice of December 20, 2004. Only Dr. Cunningham has not been so identified, because he appears only in the notice filed on January 3, 2005. However, Dr. Cunningham also testified as an expert in Dustin Honken's trial, so the government is familiar with not only the kind of mental health professional Dr. Cunningham is, but also his specific areas of expertise.

As to the rest of the information requested by the government in *Sampson,* the court determined that " 'notice' in Rule 12.2 must be read, as it was before the 2002 revision, to require meaningful notice, serving the overall purpose of the Rule"— which the court identified as providing the government with an opportunity to conduct the kind of investigation needed to acquire rebuttal testimony. In addition, the court recognized that the need for "meaningful notice" must be balanced against the defendant's Fifth Amendment right against self-incrimination and Sixth Amendment right to effective assistance of counsel. *Sampson,* 335 F.Supp.2d at 243. To address these concerns, the court in *Sampson* noted that the new rule forbids the disclosure of "the results and reports" of the *government's* experts " 'unless the defendant is found guilty of one or more capital crimes and the defendant confirms an intent to offer during sentencing proceedings expert evidence on mental conditions.' " *Id.* (quoting FED. R. CRIM. P. 12.2(c)(2)). Although the court noted that this procedure was "not constitutionally required," it was "designed to avoid litigation over whether the government has improperly made derivative use of the evidence." *Id.* (citing the 2002 Advisory Committee Notes). The court then resolved the issue of the adequacy of the defendant's notice as follows:

> Before the enactment of the new Rule 12.2, the courts were split on the propriety of the government's first request, for "the nature of the proffered mental condition(s)." [Citations omitted.] Under the new Rule, however, requiring the defendant to provide such information is no longer permissible because "the nature of the proffered mental condition(s)" is essentially the same as the "results and reports" for which early disclosure is barred. *See* Fed.R.Crim.P. 12.2(c)(2). As reflected in the parties' agreement, however, the government's other requests sought the type of information that was necessary to enable the government to hire the right type of rebuttal experts and conduct the proper tests. [Citations omitted.] The government's requests were, therefore, meritorious.

*Sampson,* 335 F.Supp.2d at 243.

This court agrees generally with the conclusion of the court in *Sampson* concerning what is required to give "meaningful notice" of the defendant's intent to present evidence on her mental condition at the "penalty phase," but based on a slightly different analysis. This court notes, first, that Rule 12.2(b) itself explicitly requires nothing more than notice that the defendant "intends to introduce expert evidence relating to a mental disease or defect or any other mental condition of the defendant bearing on ... (2) the issue of punishment in a capital case." FED. R. CRIM. P. 12.2(b). Thus, the Rule does not expressly require the defendant to disclose the "nature" of the mental disease or defect for which the defendant has been or will be examined, interviewed, or tested, as the government demands in this case. This court acknowledges, however, that the Advisory Committee has noted that the purpose of adopting a scheme under which the defendant is required to provide notice of intent to present expert evidence on her mental condition at the "penalty phase" is "so that any mental examinations can be conducted without unnecessarily delaying capital sentencing proceedings." *Id.,* Advisory Committee Comments, 2002 Amendments. To serve that purpose, the notice must provide "meaningful notice." *Accord Sampson,* 335 F.Supp.2d at 243; *see also* FED. R. CRIM. P. 12.2(b), Advisory Committee Comments, 1983 Amendments (without adequate notice, "the government would not have had an opportunity to conduct the kind of investigation needed to

acquire rebuttal testimony on the defendant's claim [of a mental condition]").

The first requirement of such "meaningful notice," as the court in *Sampson* found, was identification of the kinds of mental health professionals the defendant has selected to evaluate her. *See id.* at 242–43. This court also agrees with the court in *Sampson* that "meaningful notice" under Rule 12.2(b) would include notice of nature of the *tests* that the defendant's experts have performed or will perform, *e.g.*, the MMPI–2, the WAIS–2, etc., in the course of their evaluations of the defendant. *See id.* at 243 (the parties agreement, which included disclosure of the tests that the defendant's experts had performed as part of the Rule 12.2(b) notice, showed that the government's request for this information sought information that was necessary to enable the government to hire the right type of rebuttal experts and to conduct the proper tests). Here Johnson has offered to disclose information concerning the tests her experts have performed or will perform, but only after a "taint team" is appointed. Presumably, Johnson contemplates that the "taint team" will be responsible for hiring the government's experts, based in part on that attorney's review of the kind of experts that Johnson has employed and the tests that they have performed or will perform. The court, however, believes that the *prosecuting attorney* should have the opportunity to select the government's rebuttal mental health experts. The court also finds that Johnson will not be prejudiced by requiring her to add disclosures of the tests that her experts have performed or will perform to the disclosures that she has already made concerning her experts. Because tests like the MMPI–2 or the WAIS–2 are standard diagnostic tools, use of such tests does not disclose to the prosecuting attorneys the specific nature *of the mental condition that Johnson may assert* in such a way that either her constitutional rights or

the scheme contemplated by Rule 12.2 is violated. Therefore, the court will require Johnson to include in her supplement to her Rule 12.2(b) notice the nature of the tests that her experts have performed or will perform.

■ This court also agrees with the court in *Sampson* that the government is *not* entitled to notice of the "nature" of the defendant's mental condition prior to disclosure of the reports and results of testing by the government's experts, but parts company with the *Sampson* court over the basis for that conclusion. The court in *Sampson* read the defendant's "notice" requirements in Rule 12.2(b) in conjunction with the requirements for timing of disclosure of the "results and reports" of *the government's* experts in Rule 12.2(c)(2) to conclude that initial disclosure of the "nature" of the defendant's mental condition in the defendant's Rule 12.2(b) notice was impermissible. *See Sampson*, 335 F.Supp.2d at 243. However, this court is uncomfortable with using the limitations on disclosure of the "results and reports" of the *government's* examination in Rule 12.2(c)(2) as the basis for determining the proper scope of the *defendant's* "notice" pursuant to Rule 12.2(b). On the other hand, Rule 12.2(c)(3), which does pertain to disclosure of the results and reports of the *defendant's* expert's examination, provides for disclosure of those reports "*[a]fter* disclosure under Rule 12.2(c)(2) of the results and reports of the government's examination." FED. R. CRIM. P. 12.2(c)(3) (emphasis added). Thus, the Rule as a whole contemplates that the government will not have the "results and reports" of the defendant's experts until after the government has disclosed the "results and reports" of its own experts. If the decision in *Sampson* correctly equates "results and reports" with "the nature of the defendant's mental condition," it would seem

that, reading Rule 12.2(b) in conjunction with Rule 12.2(c)(3), the current version of the Rule does, indeed, make it impermissible to require the defendant to provide that information in its notice. *Cf. Sampson,* 335 F.Supp.2d at 243 (reaching this conclusion, but relying on a reading of Rule 12.2(b) in conjunction with Rule 12.2(c)(2)). The government does not contend here that the equation is improper, and this court finds no clear fallacy in it.

Instead, the government contends in this case that disclosure of only the tests conducted or to be conducted, without disclosing mental conditions for which the defendant has only been examined or interviewed, would not allow the government to determine the appropriate expert to hire, *i.e.,* would not provide "meaningful notice." This is so, the government asserts, because the defendant may only be interviewed about, but never tested for, certain disorders. The government also complains that some mental defects and disorders may not be appropriate for testing, but are instead evaluated through interviews or examinations. Thus, the government contends that, without knowing which disorder or disease the defendant was examined or interviewed for, as well as what tests were performed, the government would be disadvantaged in retaining the appropriate experts.

The court finds that the government's assertions of the difficulty of selecting appropriate rebuttal experts, without knowing the nature of the mental condition for which the defendant was or will be tested, interviewed, or evaluated are overblown. First, as the defendant suggests, the government's scheme would "put the cart before the horse," by reversing the scheme contemplated by Rule 12.2. That scheme requires the defendant's notice of intent to rely on mental condition evidence, followed

by court-ordered examinations, followed by the government's disclosures of its expert's reports. Only after the government's disclosures is the defendant required to make her disclosures. FED. R. CIV. P. 12.2(b),(c)(1), (c)(2), and (c)(3). Second, disclosure of the defense expert's specific identities, and hence, their qualifications and particular areas of expertise, in addition to their professions and the tests they will use, necessarily narrows the scope of mental diseases, disorders, or conditions that the government could be required to rebut.

Therefore, the disclosures that the defendant has already provided and those that she has agreed to make provide the government with the "meaningful notice" contemplated by Rule 12.2(b). The defendant's handwritten and filed notices of intent to present mental condition evidence, taken together and as the defendant has agreed to supplement them, are not insufficient, so long as the defendant makes those disclosures by the deadline the court will now set, rather than waiting until after a "taint team," if any, is in place. Therefore, the court will set a deadline for Johnson to supplement her notice with the nature of the tests (the MMPI–2 or the WAIS–2, etc.) that her experts have performed or will perform. The court will also extend the government's deadline to notify Johnson of any rebuttal experts that the government intends to use on this issue until after Johnson files her supplemented notice.[12]

### c. *Rule 12.2(c)(1): Court-ordered examination*

*i. The pertinent provision and its purpose.* New Rule 12.2 provides for court-ordered mental examinations of the

---

**12.** The January 31, 2005, deadline for the government's response insisted upon by John-

son is obviously impractical, under the circumstances.

defendant in the circumstances presented here, as follows:

**(c) Mental Examination.**

**(1) Authority to Order an Examination; Procedures ....**

**(B)** .... If the defendant provides notice under Rule 12.2(b) the court may, upon the government's motion, order the defendant to be examined under procedures ordered by the court.

Fed. R. Crim. P. 12.2(c)(1)(B). As the Advisory Committee has explained, subsection (c)(1), as amended, "clarifies the authority of the court to order mental examinations for a defendant ... in those cases where the defendant intends to present expert testimony on his or her mental condition." *Id.* Specifically, it "clarifies that the authority of the court to order a mental examination ⸳ under Rule 12.2(c)(1)(B) extends to those cases when the defendant has provided notice, under Rule 12.2(b), of an intent to present expert testimony on the defendant's mental condition, either on the merits or at capital sentencing." *Id.* However, "[t]he amendment leaves to the court the determination of what procedures should be used for a court-ordered examination on the defendant's mental condition (apart from insanity)." *Id.* (also noting that there is no statutory counterpart for such a situation, as there is for an insanity defense).

Thus, Rule 12.2(c)(1)(B) plainly provides the court with the authority, in its discretion, to order mental examinations in the circumstances presented here. Moreover, Johnson does not object to the government's request that she submit to a mental examination by government experts, although she reserves the right to contest details. Therefore, the court will order mental examinations of Johnson by government experts. However, the court must also consider Johnson's challenges to details of such examinations.

Johnson's exercise of her reserved right to contest details is embodied, first, in her request that any "taint team" established by the government to handle mental condition examinations be established in a separate United States Attorney's Office. Such an "outside taint team" would ensure that the prosecutors in her case are "firewalled" from any contact with the information at issue until disclosure is permitted under Rule 12.2(c)(2). Second, Johnson requests five days advance notice of any testing that the government's experts intend to administer. Johnson seeks such notice for two purposes: (1) to have an opportunity to challenge the validity of specific tests for persons in her circumstances; and (2) to preserve her right to consult with counsel to protect her Fifth and Sixth Amendment rights before and during any evaluation by a government expert. The court will consider these challenges in turn.

■ *ii. Johnson's request for an "outside taint team."* Again, some of the territory pertinent to a request for a "taint team" has been explored by the court in *Sampson.* In *Sampson,* the court observed, "The new Rule 12.2 does not resolve how, as a practical matter, the government experts are to conduct their mental condition examinations while adhering to the prohibition against early disclosure to the prosecutors of the 'results and reports' of those examinations." *Sampson,* 335 F.Supp.2d at 244 (also noting various kinds of issues that can arise during the course of court-ordered examinations). The court found that "[u]nder the literal language of the new Rule 12.2[(c)(2)] ..., the reports and results cannot be revealed to '*any* attorney for the government' unless and until the defendant's guilt is established and he confirms an intent to offer expert evidence on his mental condition during the penalty phase." *Id.* at

244–45 (emphasis in original). However, the court "found that it was reasonable and consistent with the goals of the new Rule to interpret 'any attorney for the government' to mean any attorney for the government in a particular prosecution except those attorneys representing the government's interests solely in connection with its experts' testing." *Id.* 245. Therefore, "[t]o avoid premature disclosure of the 'reports and results' to the prosecution team," the court directed that "firewalled" Assistant United States Attorneys would handle the government's interests in the examination of the defendant and that "the firewalled AUSAs in this case could not be members of the prosecution team and would not be allowed to join the prosecution team after any penalty phase had begun." *Id.* (contrasting that procedure with the decision in a case applying Rule 12.2 as it existed prior to the 2002 amendments, *United States v. Allen,* 247 F.3d 741, 772 (8th Cir.2001), *vacated on other grounds,* 536 U.S. 953, 122 S.Ct. 2653, 153 L.Ed.2d 830 (2002), which had permitted the prosecutor handling the defendant's mental examinations to join the prosecution team for the "penalty phase"). The court explained,

> Rule 12.2's goal of avoiding delays in capital sentencing proceedings would not be served if any problems with the government testing were not revealed until after the guilt phase. The defendant could suffer no prejudice from the firewall procedure. Indeed, the procedure might provide the defendant with an even greater sense of security that his defense strategy—including the types of mental health experts he had hired—would remain hidden from the prosecution team.

*Sampson,* 335 F.Supp.2d at 245.

This court agrees with the *Sampson* court's interpretation of Rule 12.2 as permitting an attorney *not on the prosecution team* to manage the government's mental health experts and their interactions with the defendant. Any other construction is impractical at best and absurd at worst. On the other hand, reading "any attorney for the government" within the meaning of Rule 12.2(c)(2) in the context of the whole rule shows that this phrase reasonably means "any attorney prosecuting the case." For example, the comparable reference in Rule 12.2(b) to notice to "an attorney for the government" of intent to introduce evidence of a mental disease, mental defect, or mental condition in the punishment phase of a capital case must mean "an attorney prosecuting the case," because it would make no sense if the "notice" requirement could be satisfied by notifying an Assistant United States Attorney in the Southern District of Florida assigned to Social Security and other civil cases, who would be "an attorney for the government," of an intent to use mental condition evidence in a capital prosecution pursuant to 21 U.S.C. § 848 in the Northern District of Iowa. The real concern of the Rule, the court finds from its provisions taken as a whole, is that the results and reports of the defendant's mental examinations not be revealed *to prosecuting attorneys* prior to the government's own disclosures; it does not follow from this concern that the government cannot have an attorney manage the mental examination process, so long as that attorney is not part of, and can never be part of, the prosecuting team. Therefore, appointment of a "taint team" or "taint attorney" for the government to protect the government's interests in managing the mental health examination of the defendant does not violate Rule 12.2, and this court will, consequently, direct the appointment of such a "taint team" or "taint attorney" in this case.

■ Johnson asserts that such a "taint team" or "taint attorney" should not be in the same office as the prosecutors in this case. The court notes that there are presently two "taint teams" in the United States Attorney's Office for the Northern District of Iowa working on issues in this case and that these "taint teams" have worked efficiently and effectively. Thus, there is no reason to believe that any "breakdown" of a "firewall" would be likely within that office. Moreover, the court recognizes that the risks of communications from outside of an office going astray or of some other "contamination" occurring are much higher if still more United States Attorney's Offices are involved. Nevertheless, at the hearing on January 27, 2005, the court entertained nominees from Johnson's defense counsel of appropriate districts or United States Attorney's Offices from which an "outside taint team" or "outside taint attorney" might be appointed for this case. Johnson identified three attorneys who are or were in the United States Attorney's Office for the Western District of Missouri and, without waiving any other objections to an "outside taint team," the government conceded that these attorneys would be acceptable. The court now concludes that, although not convinced that use of an "outside taint team" or "outside taint attorney" is either always necessary or necessary in this case, the court should err on the side of caution by appointing such an "outsider" or "outsiders" to protect the government's interests in this case relating to mental examinations of Johnson pursuant to Rule 12.2. The "outside taint attorney" or "outside taint attorneys" will be appointed by separate order.

The parties also discussed with the court the extent of contact, if any, that any "outside taint attorney" should have with the prosecutors in this case or the means by which an "outside taint attorney" should otherwise be provided with information about this case. The court concludes that any contact between an "outside taint attorney" and the United States Attorney's Office for the Northern District of Iowa prior to the disclosures authorized by Rule 12.2(c)(2), must be strongly discouraged in order to protect the integrity of the "firewall." Therefore, the sources of information available to the "outside taint attorneys" shall be the indictments in this case, this ruling, and the designations of mental health experts provided to the prosecution by the defendant. Should the "outside taint attorneys" find that they require additional information from the record in this case, they may request from the Clerk of Court access to the docket and filings in this case through the CM/ECF electronic filing and docketing system to the same extent such access is provided to the prosecutors in this case. Should the "outside taint attorneys" find that an inquiry must be made to the prosecutors in this case, such an inquiry must be made in either of two ways: (1) in writing, with a copy filed under seal until after the Rule 12.2(c)(2) disclosures have been made, and the copy must be disclosed with those Rule 12.2(c)(2) disclosures; or (2) in a pre-arranged telephone call with a court reporter making a complete record of the conversation, which shall also be filed under seal until after the Rule 12.2(c)(2) disclosures have been made, and then disclosed with those Rule 12.2(c)(2) disclosures. The flow of information between the prosecutor and the "outside taint attorneys" must be entirely one-way, with the "taint attorneys" seeking information and the prosecutor providing it.

Johnson raises two more interrelated issues concerning procedures for any court-ordered mental examinations: (1) She requests advance notice of any government testing, to have the opportunity to challenge testing of dubious validity and to assert her Fifth and Sixth Amendment

rights, and (2) she also requests adequate procedures otherwise to protect her Fifth and Sixth Amendment rights.

■ *iii. Johnson's demand for notice.* In *Sampson,* the defendant also requested advance notice of testing so that counsel could make a *Daubert* challenge to certain testing procedures and so that defense counsel could properly advise the defendant of the scope and nature of the proceeding. *Sampson,* 335 F.Supp.2d at 245–46. The court, however, was "not persuaded by the defendant's *Daubert* argument," primarily because a dispute about tests could become moot if neither party ultimately attempted to admit the test results in question, making a pre-test *Daubert* analysis a potential waste of judicial resources as well as a means to frustrate Rule 12.2's goal of avoiding delay in capital cases. *Id.* at 246. This court agrees. Johnson's assertion that she must have the opportunity to challenge test procedures before they are administered is an example of Johnson "putting the cart before the horse" in her turn, because even if tests of "dubious validity" are performed, the time to challenge admissibility of the results of those tests is at the time, if ever, that her mental condition is actually put at issue in a sentencing proceeding.

On the other hand, the court in *Sampson* found that adequate notice of testing or examinations should be required to afford the defendant the opportunity to consult with counsel; to allow better coordination of access to the defendant between the government's experts and the defense's experts; and to provide "symmetry" to the parties' pre-testing obligations. *Sampson,* 335 F.Supp. at 246. This court agrees that these reasons support requiring the government to give Johnson's defense team at least five days notice of any tests, examinations, or interviews by government mental health experts.

■ *iv. Johnson's demand for Fifth and Sixth Amendment protections.* This conclusion leaves the question of whether advance notice of testing and other procedures are also sufficient to protect Johnson's Fifth and Sixth Amendment rights. Johnson puts much energy into attempting to establish that her Fifth and Sixth Amendment rights are implicated by mental examinations and that those rights will be adversely affected if her counsel or a defense expert is not present at the government's tests or interviews. Therefore, the court must examine the scope of Johnson's Fifth and Sixth Amendment rights as they relate to mental health examinations pursuant to Rule 12.2 and what measures are sufficient to protect those rights.

In *Estelle v. Smith,* 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), the Supreme Court explained that "[t]he Fifth Amendment privilege [against self-incrimination] is directly involved [where] the State use[s] as evidence against the [defendant] *the substance of his disclosures* during [a] pretrial psychiatric examination." *Smith,* 451 U.S. at 464–65, 101 S.Ct. 1866 (emphasis added). Therefore, the Court held that a capital defendant's Fifth Amendment right against compelled self-incrimination precludes the state from subjecting the defendant to a psychiatric examination concerning "future dangerousness" without first informing the defendant that he or she has a right to remain silent and that anything he or she says can be used against him or her in a sentencing proceeding. *Smith,* 451 U.S. at 461–69, 101 S.Ct. 1866; *see also Powell v. Texas,* 492 U.S. 680, 680–81, 109 S.Ct. 3146, 106 L.Ed.2d 551 (1989) *(per curiam)* (so characterizing the holding in *Smith*). Moreover, the Court held in *Smith* that "[a] criminal defendant, who neither initiates a psychiatric evaluation nor attempts to introduce any psychiatric evidence, may not be compelled to respond to a psychiatrist

if his statements can be used against him at a capital sentencing proceeding." *Smith,* 451 U.S. at 467–68, 101 S.Ct. 1866. Therefore, under those "distinct circumstances," admission of a psychiatrist's testimony violates the defendant's Fifth Amendment right against self-incrimination. *Id.* at 466, 101 S.Ct. 1866.

On the other hand, the Supreme Court subsequently noted in *Powell* that its decisions in *Smith* and *Buchanan v. Kentucky,* 483 U.S. 402, 107 S.Ct. 2906, 97 L.Ed.2d 336 (1987), provide "some support" for the conclusion that a defendant waives his or her Fifth Amendment right against self-incrimination when the defendant puts his or her mental condition at issue:

> In *Smith* we observed that "[w]hen a defendant asserts the insanity defense and introduces supporting psychiatric testimony, his silence may deprive the State of the only effective means it has of controverting his proof on an issue that he has interjected into the case." 451 U.S. at 465, 101 S.Ct. at 1874. And in *Buchanan* the Court held that if a defendant requests a psychiatric examination in order to prove a mental-status defense, he waives the right to raise a Fifth Amendment challenge to the prosecution's use of evidence obtained through that examination to rebut the defense. 483 U.S. at 422–423, 107 S.Ct. at 2917–2918.

*Powell,* 492 U.S. at 684, 109 S.Ct. 3146; *see also Penry v. Johnson,* 532 U.S. 782, 794, 121 S.Ct. 1910, 150 L.Ed.2d 9 (2001) (recognizing that *Estelle* is distinguishable, and hence, there may be no Fifth Amendment violation, where the defendant "himself made his mental status a central issue in ... his trial[ ] for ... murder," and has thereby placed his mental condition "at issue," but noting that "[w]e need not and do not decide whether these differences affect the merits of [a defendant's] Fifth Amendment claim," because the issue in

that *habeas* action was whether a state court's decision was contrary to or an unreasonable application of the Court's precedent).

Turning to a defendant's Sixth Amendment right to counsel, in *Buchanan v. Kentucky,* 483 U.S. 402, 107 S.Ct. 2906, 97 L.Ed.2d 336 (1987), the Court found that a defendant "undoubtedly had" a Sixth Amendment right to consultation with counsel concerning mental examinations. *Buchanan,* 483 U.S. at 424, 107 S.Ct. 2906; *see also Powell,* 492 U.S. at 681, 109 S.Ct. 3146 (noting that, in *Smith,* the Court had unanimously held that, "once a capital defendant is formally charged, the Sixth Amendment right to counsel precludes such an examination without first notifying counsel that 'the psychiatric examination [will] encompass the issue of their client's future dangerousness,' " citing *Smith,* 451 U.S. at 471, 101 S.Ct. 1866, and that the Court had "reaffirmed this Sixth Amendment protection" in *Satterwhite v. Texas,* 486 U.S. 249, 254, 108 S.Ct. 1792, 100 L.Ed.2d 284 (1988), "emphasizing that 'for a defendant charged with a capital crime, the decision whether to submit to a psychiatric examination designed to determine his future dangerousness is "literally a life and death matter" which the defendant should not be required to face without "the guiding hand of counsel" ' "). Moreover, to be "effective," the Court held that the right to consultation with counsel (1) "must be based on counsel's being informed about the scope and nature of the proceeding," and (2) "would depend on counsel's awareness of the possible uses to which [the defendant's] statements in the proceedings could be put." *Id.* at 424–25.

The Supreme Court has recognized that analysis of waiver of a defendant's Sixth Amendment right to counsel as to a mental examination is different from analysis of the waiver of a defendant's Fifth Amend-

ment right against self-incrimination in such circumstances. *See Powell,* 492 U.S. at 685, 109 S.Ct. 3146 ("The distinction between the appropriate Fifth and Sixth Amendment analyses was recognized in the *Buchanan* decision. In that case, the Court held that the defendant waived his Fifth Amendment privilege by raising a mental-status defense. 483 U.S. at 421– 424, 107 S.Ct. at 2916–2918. This conclusion, however, did not suffice to resolve the defendant's separate Sixth Amendment claim. Thus, in a separate section of the opinion the Court went on to address the Sixth Amendment issue, concluding that on the facts of that case counsel knew what the scope of the examination would be before it took place. *Id.* at 424–425, 107 S.Ct. at 2919."); *Buchanan,* 483 U.S. at 424–25, 107 S.Ct. 2906 (analyzing waiver of the Sixth Amendment right separately from waiver of the Fifth Amendment right). In *Buchanan,* the Court found that "thee was no Sixth amendment violation" where there was no question that defense counsel had been informed of the "nature and scope" of the "mental health" proceedings, and defense counsel was "on notice that if . . . he intended to put on a 'mental status' defense for [the defendant], he would have to anticipate the use of psychological evidence by the prosecution in rebuttal." *Buchanan,* 483 U.S. at 424– 25, 107 S.Ct. 2906.

After a review of Supreme Court precedent, the Third Circuit Court of Appeals summarized the "landscape" for Fifth and Sixth Amendment rights as they applied to compelled mental health examinations, as follows:

> A compelled psychiatric interview implicates Fifth and Sixth Amendment rights (*Smith*). Before submitting to that examination, the defendant must receive Miranda warnings and (once the Sixth Amendment attaches) counsel must be notified (*Smith*). The warnings must advise the defendant of the "conse-

quences of foregoing" his right to remain silent (*Smith*). The Fifth and Sixth Amendments do not necessarily attach, however, when the defendant himself initiates the psychiatric examination (*Buchanan, Penry*). Similarly, the Fifth—but not Sixth—Amendment right can be waived when the defendant initiates a trial defense of mental incapacity or disturbance, even though the defendant had not been given Miranda warnings (*Buchanan, Powell*). But that waiver is not limitless; it only allows the prosecution to use the interview to provide rebuttal to the psychiatric defense (*Buchanan, Powell*). Finally, the state has no obligation to warn about possible uses of the interview that cannot be foreseen because of future events, such as uncommitted crimes (*Penry*).

*Gibbs v. Frank,* 387 F.3d 268, 274 (3d Cir.2004); *see also United States v. Curtis,* 328 F.3d 141, 145 (4th Cir.2003)(noting that it had previously held in *Savino v. Murray,* 82 F.3d 593, 604 (4th Cir.1996), that " '[i]n essence, the defendant waives his right to remain silent . . . by indicating that he intends to introduce psychiatric testimony,' " and that Rule 12.2(c) permits the government to introduce expert testimony if the defendant has raised the issue of his mental condition).

This court notes that the provisions of Rule 12.2(c)(4) concerning use of the defendant's statements in the course of a mental examination were specifically written "to more accurately reflect the Fifth Amendment considerations at play in this context." *See* FED. R. CRIM. P. 12.2, Advisory Committee Notes, 1983 Amendments (citing *Smith,* 451 U.S. at 454, 101 S.Ct. 1866). Moreover, as amended in 2002,

> Rule 12.2(c)(4) provides that the admissibility of such evidence in a capital sentencing proceeding is triggered only by the defendant's introduction of expert

evidence. The Committee believed that, in this context, it was appropriate to limit the government's ability to use the results of its expert mental examination to instances in which the defendant has first introduced expert evidence on the issue.

*Id.*, 2002 Amendments. To achieve these goals of protecting the defendant's Fifth Amendment rights, Rule 12.2(c)(4) provides, in pertinent part, as follows:

> **(4) Inadmissibility of a Defendant's Statements.** No statement made by a defendant in the course of any examination conducted under this rule (whether conducted with or without the defendant's consent), no testimony by the expert based on the statement, and no other fruits of the statement may be admitted into evidence against the defendant in any criminal proceeding except on an issue regarding mental condition on which the defendant:
>
> \* \* \* \* \* \*
>
> **(B)** has introduced expert evidence in a capital sentencing proceeding requiring notice under Rule 12.2(b)(2).

FED. R. CRIM. P. 12.2(c)(4). Thus, until and unless the defendant waives the Fifth Amendment right against self-incrimination by putting his or her mental condition at issue in a sentencing proceeding, Rule 12.2(c)(4) protects that right by prohibiting the use in *any criminal proceeding* of the defendant's statements during a mental examination, an expert's testimony based on those statements, or any "fruits" of those statements. Rule 12.2 does not, however, contain any provisions specifying the manner in which a defendant's Sixth Amendment right to counsel is to be protected in the context of a mental examination.

The court concludes that the mental examinations, evaluations, and interviews at issue here *do*, at least as a general matter, implicate Johnson's Fifth and Sixth

Amendment rights. *See Smith,* 451 U.S. at 464–66, 101 S.Ct. 1866. Thus, to protect her Fifth Amendment right in the first instance, Johnson would be entitled to notice that she has a right to remain silent and that anything she says during the examination can be used against her in a sentencing proceeding, *see id.* at 461–69, 101 S.Ct. 1866, and that if she "neither initiates a psychiatric evaluation nor attempts to introduce any psychiatric evidence," she "may not be compelled to respond to a psychiatrist if [her] statements can be used against [her] at a capital sentencing proceeding." *Id.* at 467–68, 101 S.Ct. 1866. In the present circumstances, however, Johnson has given notice that she is at least *considering* placing her mental condition at issue during the sentencing phase, if any, of her trial. Thus, her notice of intent entitles the government to request mental examinations pursuant to Rule 12.2. Moreover, if she actually puts her mental condition at issue, she will have waived her right to raise a Fifth Amendment challenge to the prosecution's use of evidence obtained through the court-ordered examinations to rebut her mental health defense. *Powell,* 492 U.S. at 684, 109 S.Ct. 3146.

In the event that Johnson puts her mental condition at issue, her waiver of her Fifth Amendment right is not "limitless." *Gibbs,* 387 F.3d at 274. Thus, some protection is still required. The court finds that the residual protection required is provided, in the first instance, by Rule 12.2(c)(4), as amended. As explained above, until and unless Johnson waives her Fifth Amendment right against self-incrimination by putting her mental condition at issue in a sentencing proceeding, Rule 12.2(c)(4) protects that right by prohibiting the use in *any criminal proceeding* of her statements during a mental examination, an expert's testimony based on those statements, or any "fruits" of

those statements. FED. R. CRIM. P. 12.2(c)(4). Still other measures are appropriate here, however.

■ For example, in *Sampson*, the defendant originally requested that the court allow a defense representative, including a defense expert, to be present during any clinical interviews or testing of the defendant, but later "indicated that having the interviews tape-recorded and the recordings provided immediately to defense counsel would be a satisfactory alternative." *Id.* In *Sampson*, the court found that tape-recording the testing and interviews adequately protected the defendant's Fifth Amendment right against self-incrimination:

> The defendant could not present expert testimony on his mental condition and yet refuse, on Fifth Amendment grounds, to answer questions put to him by the government's experts. *See* Fed. R.Crim.P. 12.2(d); *cf. United States v. Bartelho*, 129 F.3d 663, 673–74 (1st Cir. 1997) (striking defendant's direct testimony because he refused to answer related questions on cross-examination). Defense counsel's presence at the testing would not have been necessary to protect Sampson's Fifth Amendment rights because Rule 12.2 provides that "[n]o statement made by a defendant in the course of any examination conducted under this rule ... and no other fruits of the statement may be admitted into evidence against the defendant in any *criminal proceeding* except on an issue regarding mental condition" on which the defendant has introduced expert evidence pursuant to Rule 12.2. Fed. R.Crim.P. 12.2(c)(4) (emphasis added); *see* 1983 Advisory Committee Notes (stating that Rule 12.2(c) was written to

"reflect the Fifth Amendment considerations" addressed in Estelle); *State v. Martin*, 950 S.W.2d 20, 25 (Tenn.1997) (concluding that Tennessee's version of Rule 12.2 "achieve[s] the balancing of interests stressed" in *Estelle* and thus defendant had no Fifth Amendment right to have defense counsel and experts present at government's examination).

*Sampson*, 335 F.Supp.2d at 247. Johnson has not made a similar concession that tape-recording would adequately protect her Fifth Amendment rights, but this court nevertheless concludes that Johnson's Fifth Amendment rights will be adequately protected by advance notice of testing and an order requiring audiotaping of all testing and interviews of Johnson by government experts and the same-day or next-day provision of those recordings to defense counsel. *Id.* at 247–48 (requiring audiotape recording).[13]

■ Although Johnson has not asserted that she should have first and exclusive access to the audiotape recordings, to assist her in determining whether or not she should actually put her mental condition at issue during sentencing proceedings, the court will nevertheless consider that question. Recently, in *Gruning v. DiPaolo*, 311 F.3d 69 (1st Cir.2002), a petitioner for *habeas* relief did assert that the state court violated his Fifth Amendment rights by failing to give him exclusive access to audiotape recordings of his mental examinations, in order to assist him in determining whether or not to waive his right to remain silent by putting his mental condition at issue. However, the court concluded that " 'the law ordinarily considers a waiver knowing, intelligent, and sufficiently aware

---

**13.** Although the court indicated at the hearing that it was considering requiring videotaping of all testing and interviews of Johnson, defense counsel opined that audiotaping would be less intrusive, so that of the two procedures, defense counsel would prefer audiotaping. The court concludes that, under these circumstances, audiotaping is satisfactory.

if the defendant fully understands the nature of the right and how it would likely apply *in general* in the circumstances—even though the defendant may not know the *specific detailed* consequences of invoking it.'" *Gruning*, 311 F.3d at 72–73 (quoting *United States v. Ruiz*, 536 U.S. 622, 122 S.Ct. 2450, 2455–57, 153 L.Ed.2d 586 (2002)) (emphasis in the original). Applying this standard, the court held that, "[w]ithout hearing the audiotape, both [the petitioner] and his attorney understood the nature of petitioner's right against self-incrimination 'and how it would likely apply in general in the circumstances,' thus satisfying constitutional requirements." *Id.* at 73 (quoting *Ruiz*, 122 S.Ct. at 2455).

The court in *Gruning* recognized that "the defense would prefer exclusive access to the evidence and that, from the defense's point of view, the mere possession of incriminating evidence by the prosecution creates a disadvantage for the defense," but the court nevertheless concluded that there was no "constitutional infirmity," because "allowing the prosecution to hear the audiotape was a mild condition, far removed from Fifth Amendment compulsion," where the petitioner "could have chosen both to listen to the audiotape and to invoke his privilege against self-incrimination." *Id.* In that circumstance, "[t]he prosecution would have had possession of incriminating statements, but could not have used the statements in court unless the defense put the psychiatric evaluation into issue by having petitioner or his psychiatric expert testify." *Id.* (citing the applicable provision of the state rule of criminal procedure, Mass. R.Crim. P. 14(b)(2)(B)(iii)). Therefore, the court held that the petitioner's "decision of whether or not to waive his privilege against self-incrimination was knowing and intelligent, and did not require the court to provide him sole access to the audiotape of his psychiatric examination." *Id.*

Here, the court finds that, like Massachusetts Rule of Criminal Procedure 14(b)(2)(B)(iii), Rule 12.2(c)(4) of the Federal Rules of Criminal Procedure provides adequate protection from improper use of statements made during mental examinations. *See* FED. R. CRIM. P. 12.2(c)(4) (no use may be made of defendant's statements in any criminal proceeding unless the defendant puts his or her mental condition at issue in a sentencing proceeding). The court also agrees with the court in *Gruning* that, in the circumstances presented here, even "[w]ithout hearing the audiotape, both [Johnson] and [her] attorney underst[an]d the nature of [Johnson's] right against self-incrimination 'and how it would likely apply in general in the circumstances,' thus satisfying constitutional requirements." *Gruning*, 311 F.3d at 73 (quoting *Ruiz*, 122 S.Ct. at 2455). Nevertheless, Federal Rule 12.2(c) bars disclosure of testing results and reports to the government until the defendant is found guilty and "confirms an intent to offer during sentencing proceedings expert evidence on mental condition." FED. R. CRIM. P. 12.2(c)(2). The court concludes that, by extension, this provision should bar disclosure to the prosecutors in this case of the audiotape recordings of Johnson's mental examinations or interviews until the disclosures of results and reports of experts is also permitted under Rule 12.2(c)(2), because the recordings would be, in a sense, the "raw data" on which the experts' reports and results would be based, and Johnson will not waive her right against self-incrimination until she actually confirms her intention to put her mental condition at issue. *See* FED. R. CRIM. P. 12.2(c)(2) (the results of the government's examinations are not to be disclosed until the defendant confirms her intent to offer mental condition evidence).

■ Next, the court concludes that Johnson "undoubtedly ha[s]" a Sixth

Amendment right to consultation with counsel concerning mental examinations. *Buchanan,* 483 U.S. at 424, 107 S.Ct. 2906; *see also Powell,* 492 U.S. at 681, 109 S.Ct. 3146. However, the court also concludes that Johnson's Sixth Amendment right to counsel will be adequately protected by advance notice of testing and the recording of her examinations and interviews; there is no need for either defense counsel or a defense expert to be present during such testing. The Supreme Court's decision in *Buchanan* suggests that, for effective exercise of her Sixth Amendment rights, defense counsel must be informed of the "nature and scope" of the "mental health" proceedings, which Johnson will receive as directed in this order. Moreover, in this case, there is no question that defense counsel is already "on notice that if . . . [Johnson's attorneys] intend[ ] to put on a 'mental status' defense for [Johnson], [they] would have to anticipate the use of psychological evidence by the prosecution in rebuttal." *Buchanan,* 483 U.S. at 424–25, 107 S.Ct. 2906. Thus, if advance notice of testing is provided, there would be no Sixth Amendment violation. Furthermore, here, as in *Sampson,* factors such as the rights implicated, the nature of the tests, the effect of the presence of a defense representative on the validity and reliability of those tests, and the purposes for which defense counsel wishes to be present, as well as the advance notice and audiotaping procedures described above, all lead the court to conclude that it is unnecessary for defense counsel or a defense expert to be present during testing. *See Sampson,* 335 F.Supp.2d at 247–48.

*v. Summary.* In this case, the court will appoint an "outside taint attorney" or "outside taint attorneys" to manage the government's mental health experts and any other issues relating to court-ordered mental health examinations of Johnson. The "outside taint attorneys" shall not participate in the prosecution of Johnson at any stage of these proceedings. The "outside taint attorneys" shall provide Johnson's defense counsel with at least five days advance notice of any mental examinations or interviews of Johnson by the government's experts, including the "nature and scope" of such examinations or interviews. Furthermore, all testing or interviews conducted by the government's mental health experts pursuant to Rule 12.2(c)(1)(B) shall be audiotaped in their entirety and those tapes shall be provided to defense counsel by same-day or next-day delivery upon the conclusion of each testing or interview session. The recordings shall not be disclosed to the prosecutors in this case until and unless disclosures pursuant to Rule 12.2(c)(2) become appropriate, as explained below.

### d. Rule 12.2(c)(2) & (3): Disclosure and use of results

Finally, Rule 12.2 provides for the disclosure and use of the results of mental examinations of the defendant. Apart from the Fifth and Sixth Amendment concerns addressed above, there does not appear to be any dispute in this case, at this time, about how the parties are to comply with the "disclosure and use" requirements of Rule 12.2(c)(2) and (3).[14] Therefore, the

---

**14.** Indeed, the Advisory Committee's comments on these provisions reflect many of the Fifth and Sixth Amendment concerns that the court has already explored above, in reference to the details of the examinations. The pertinent parts of the Advisory Committee's explanation of these provisions are the following:

Additional changes address the question when the results of an examination ordered under Rule 12.2(b)(2) may, or must, be disclosed. *The Supreme Court has recognized that use of a defendant's statements during a court-ordered examination may compromise the defendant's right against self-incrimination. See Estelle v. Smith,* 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981) (de-

court does not find it necessary to reiterate the requirements of these provisions. Suffice it to say that the court's order for mental examinations of the defendant shall incorporate the disclosure provisions of Rule 12.2(c)(2) and (3), as well as the use provisions in Rule 12.2(c)(4).

### F. The Defendant's Motion To Strike The Death Penalty

██ The court turns next to Johnson's various motions in the "second round" of pretrial motions. The first such motion is Johnson's December 8, 2004, Motion To Strike Death Penalty (docket no. 230). In this motion, Johnson seeks an order striking the death penalty as an available penalty for the murders of Greg Nicholson, Lori Duncan, and Terry DeGeus. The government resisted this motion on December 27, 2004 (docket no. 256).

#### 1. Arguments of the parties

Johnson asserts that, in this case, the court should bar the death sentence, or any punishment questions for potential jurors, owing to intra-case proportionality principles and in the interests of justice. More specifically, in her motions, Johnson contends that, she is charged with aiding and abetting Dustin Honken's commission of five murders; that Honken was alleged to have shot the five victims and was the principal in the murders; and the jury convicted Honken, but rejected the death penalty for the murders of the adults.

---

fendant's privilege against self-incrimination violated when he was not advised of right to remain silent during court-ordered examination and prosecution introduced statements during capital sentencing hearing). *But subsequent cases have indicated that the defendant waives the privilege if the defendant introduces expert testimony on his or her mental condition.* See, e.g., *Powell v. Texas,* 492 U.S. 680, 683–84, 109 S.Ct. 3146, 106 L.Ed.2d 551 (1989); *Buchanan v. Kentucky,* 483 U.S. 402, 421–24, 107 S.Ct. 2906, 97 L.Ed.2d 336 (1987); *Presnell v. Zant,* 959 F.2d 1524, 1533 (11th Cir.1992); *Williams v. Lynaugh,* 809 F.2d 1063, 1068 (5th Cir.1987); *United States v. Madrid,* 673 F.2d 1114, 1119–21 (10th Cir.1982). *That view is reflected in Rule 12.2(c), which indicates that the statements of the defendant may be used against the defendant only after the defendant has introduced testimony on his or her mental condition....*

The proposed change in Rule 12.2(c)(2) adopts the procedure used by some courts to seal or otherwise insulate the results of the examination until it is clear that the defendant will introduce expert evidence about his or her mental condition at a capital sentencing hearing; i.e., after a verdict of guilty on one or more capital crimes, and a reaffirmation by the defendant of an intent to introduce expert mental-condition evidence in the sentencing phase. *See, e.g., United States v. Beckford,* 962 F.Supp. 748 (E.D.Va.1997). Most courts that have addressed the issue have recognized that if the government obtains early access to the accused's statements, it will be required to show that it has not made any derivative use of that evidence. Doing so can consume time and resources. *See, e.g., United States v. Hall, supra,* 152 F.3d at 398 (noting that sealing of record, although not constitutionally required, "likely advances interests of judicial economy by avoiding litigation over [derivative use issue]").

.... New Rule 12.2(c)(3) provides that upon disclosure under subdivision (c)(2) of the results and reports of the government's examination, disclosure of the results and reports of the defendant's expert examination is mandatory, if the defendant intends to introduce expert evidence relating to the examination.

.... As amended, Rule 12.2(c)(4) provides that the admissibility of [the defendant's statements during the course of an examination conducted under the rule] in a capital sentencing proceeding is triggered only by the defendant's introduction of expert evidence. *The Committee believed that, in this context, it was appropriate to limit the government's ability to use the results of its expert mental examination to instances in which the defendant has first introduced expert evidence on the issue.*

Fed. R. Crim. P. 12.2, Advisory Committee Comments, 2002 Amendments (emphasis added).

Under these circumstances, Johnson argues that imposition of the death penalty upon her for only aiding and abetting the murder of the adults would be constitutionally disproportionate in violation of the Eighth Amendment.

In her supporting brief, Johnson contends that the court has the inherent power to reject death as a possible punishment in this case as either unconstitutional or as arbitrary under the statute. She contends that judicial review of the possible penalty, either before or after trial, is a fundamental protection to which she is entitled. She points out that, even though the applicable statute labels the jury's verdict for death a "recommendation," it elsewhere makes that recommendation binding. Consequently, she contends that the statutory provisions permitting appellate review of arbitrariness suggest that the trial court should make such an "arbitrariness" determination in the first instance before bowing to the jury's binding recommendation. She argues, next, that relative culpability is an important sentencing concern and that "grossly" disproportionate treatment of capital co-defendants by the government must be rejected. For example, she points out that the courts and Congress have both recognized that less harsh treatment of equally culpable accomplices, or more culpable ringleaders, is an important mitigating factor in deciding whether to impose a life or death sentence. Indeed, she points out that a provision of the applicable death-penalty statute here, 21 U.S.C. § 848(m)(8), expressly provides that the fact that "[a]nother defendant or defendants, equally culpable in the crime, will not be punished by death" is a mitigating factor that "shall" be considered.

Finally, Johnson contends that, even if her conduct, as proved at trial, meets the "*Enmund/Tison* threshold" for imposition of the death penalty, fundamental fairness and proportionality should bar imposition of such a penalty, where Honken, the convicted "shooter," did not receive a death sentence for the killings of the three adult victims, and she is only charged as an aider and abettor. Thus, she contends that prosecuting her for a capital offense for these three murders "is irrational and disproportionate."

In resistance to Johnson's motion, the government contends that Johnson has cited no authority that would permit a federal trial court to bar the government from seeking the death penalty. Instead, the government points out that Johnson has relied on state cases holding that a trial court may conduct a proportionality review and bar the prosecution from seeking the death penalty. The government contends that even these state cases, to the extent that they involve the death penalty at all, involve a *post-trial* review of the evidence, not a pretrial preview and anticipatory ruling. Some of these state cases also involved state statutes that gave the trial judge the authority to determine the ultimate sentence, giving due consideration to the jury's verdict, but the applicable federal statute makes the jury's "recommendation" of a death sentence binding on the federal trial court. Here, the government points out that Johnson does not contend that any statutory basis for imposition of the death penalty is absent in her case.

The government also contends that the "relative culpability" argument upon which Johnson relies is a matter for the jury, not the court. The government points out that Honken *did* receive the death penalty, albeit not on all charges, so that there is no actual disproportionality in the government seeking the death sentence against Johnson. Next, the government points out that Johnson is wrong in her assertion that she is only charged as an "aider and abettor." While the government acknowledges that the primary evidence will be that

Honken pulled the trigger during the murders, there will be sufficient evidence that Johnson did or may have pulled the trigger on one or more victims to make her the principal, not simply an "aider and abettor." The government also argues that, even if Johnson was not the "trigger man," she could be just as culpable as Honken, or more culpable than Honken, for the actual murders. For example, the government asserts that the evidence may show that Johnson pressured and urged Honken to commit the actual killings. Thus, the government contends that it is not proper to determine the culpability issue prior to the presentation of evidence. Finally, the government contends that the jury can, and must be instructed to, give consideration to the sentences imposed upon Honken as a mitigating factor in Johnson's case pursuant to 21 U.S.C. § 848(m)(8). However, the fact that relative culpability is a statutory mitigating factor, the government contends, does not make it appropriate to bar the death penalty at this point in the proceedings.

### 2. Analysis

Even assuming that the court has the authority to bar the government from seeking the death penalty, when the government has otherwise satisfied the requirements for the death penalty under 21 U.S.C. § 848, the court will not do so in this case, for several reasons. First, the premise of Johnson's motion to strike the death penalty is flawed. Johnson is not charged only as an "aider and abettor" in the murders of Greg Nicholson, Lori Duncan, Kandi Duncan, Amber Duncan, or Terry DeGeus. Rather, in each of the ten counts still at issue, the Second Superseding Indictment charges that Johnson "intentionally killed *and* counseled, commanded, induced, procured, caused, *and* aided and abetted the intentional killing of [the victim at issue], and such killing resulted." *See* Second Superseding Indictment,

Counts I–X (emphasis added). The conviction of one co-defendant as a principal does not necessarily foreclose the conviction of another co-defendant as a principal, for example, because of the possible permutations of the roles of co-defendants in any offense. *Cf. Standefer v. United States*, 447 U.S. 10, 100 S.Ct. 1999, 64 L.Ed.2d 689 (1980) (a defendant accused of aiding and abetting in the commission of a federal offense may be convicted after the named principal has been acquitted of that offense in a previous trial); *United States v. Hornaday*, 392 F.3d 1306, 1311 (11th Cir.2004) ("A defendant can be properly convicted as a principal under [18 U.S.C.] § 2 even when he has not personally 'commit[ed]' all the acts constituting the elements of the substantive crime aided.' ").

Second, the death-penalty statute at issue here expressly places before the jury, *as a mitigating factor*, the question of the propriety of imposing the death penalty on a defendant whose co-defendant, "equally culpable in the crime, will not be punished by death." 21 U.S.C. § 848(m)(8). Therefore, the statutory scheme expressly contemplates the argument that Johnson believes should bar the death penalty in her case and places it *before the jury*. Moreover, that determination is to be made after consideration of all of the evidence, including the "penalty phase" evidence, not before the court pretrial. Indeed, the court concludes that Johnson's arguments in support of this motion are more properly directed to the jury or to the appellate court on post-trial review than to this court on pretrial motions.

Therefore, Johnson's December 8, 2004, Motion To Strike Death Penalty (docket no. 230) will be denied.

### G. The Defendant's Motion To Exclude Prior Jury Determinations As To Honken

The next motion before the court is the defendant's December 10, 2004, Mo-

tion In Limine Re: Prior Determinations Of Guilt And Punishment Re: Dustin Honken (docket no. 234). This motion seeks exclusion, during jury selection, opening statements, trial, or closing arguments, of evidence of the following matters: (1) Honken's guilty plea and sentence in 1997 on drug-trafficking offenses or his conviction, and (2) the "penalty phase" verdict against Honken rendered by a jury in late 2004 in the companion case involving the murder of the same witnesses Johnson is charged with murdering. The government resisted this motion on December 27, 2004 (docket no. 257).

### 1. Arguments of the parties

In support of her motion, Johnson asserts that the rule is that evidence of a co-defendant's or alleged accomplice's conviction of an offense for which the defendant is being tried is ordinarily inadmissible. The reason for the rule, she contends, is that the defendant is entitled to have her guilt determined upon the evidence against her, not upon the disposition of charges against a co-defendant. Moreover, the defendant has a right to confront and cross-examine the witnesses against her, which she cannot do if the conviction is based on the conviction of a co-defendant. Because the charges in her case and in Honken's 2004 trial are interconnected, Johnson contends that it would be particularly damaging for the jury to hear in jury selection, opening statements, or closing arguments in her case about Honken's 2004 conviction. Johnson concedes that evidence that Honken was convicted of drug offenses in 1997 might be relevant, but the particular crimes for which he was charged and convicted and the nature of his punishment for those convictions are not.

The government resists Johnson's motion only in part. The government contends that it is proper to introduce evidence of the drug charges against Honken

that led to his conviction in 1997, and the nature of his sentence for those crimes, although the government agrees that it would not be proper for the government to introduce evidence that Honken was convicted of the murder charges and related offenses in 2004 or evidence of the jury's "penalty phase" verdicts. However, the government reserves the right to respond if Johnson raises these issues during direct or cross-examination of any witnesses or through comments or arguments of counsel.

More specifically, as to Honken's 1997 conviction, the government contends that it is necessary to disclose to the jury that Honken was charged with distributing and attempting to manufacture methamphetamine to put in context his statements to Cutkomp, Cobeen, and others. The government also contends that evidence will be presented about events during and surrounding Honken's sentencing hearing in the 1997 conviction, although the government agrees that the actual sentence imposed on Honken as a result of his 1997 conviction is not relevant.

As to Honken's 2004 conviction, the government agrees that the jury could improperly infer that Johnson is guilty because another jury found her co-defendant guilty of the same offenses, so the government states that it will not introduce evidence of Honken's 2004 conviction or verdict for a death sentence, or mention them during any argument to the jury, during the "merits phase" in Johnson's case. However, the government points out that it would be equally improper for the jury to infer that Honken was acquitted from the absence of evidence about the disposition of his case. Therefore, the government requests that the court instruct the jury as follows:

Dustin Honken's case is the subject of a separate prosecution. You are not to

concern yourself with that case, discuss it, or speculate about its outcome. Only defendant Angela Johnson is on trial in this case, and only on the charges contained in the indictment.

In short, the government asserts that Honken's 1996 charges and subsequent conviction in 1997 are admissible, but his sentence is not; Honken's 2004 conviction and jury "penalty" verdict are not admissible; and the jury should be instructed to disregard Honken's status.

### 2. Analysis

#### a. Honken's 1997 conviction

The parties agree that the fact of Honken's conviction in 1997 is relevant, and they also agree that his sentence on that conviction is not. However, Johnson contends that the "particular crimes" with which Honken was charged and to which he pleaded guilty in the earlier case are not relevant. The government, on the other hand, contends that it is necessary for the jury to know that Honken was charged with distributing methamphetamine and attempting to manufacture methamphetamine to put in context his statements to Cutkomp and Cobeen. The court concludes that the government has the better end of the disputed issues as to Honken's earlier conviction.

More specifically, Rule 403 of the Federal Rules of Evidence does not require exclusion of the evidence of the particular crimes with which Honken was charged in 1996 and to which he pleaded guilty in 1997. *See* FED. R. EVID. 403 (permitting the court to exclude relevant evidence, *inter alia,* if it is unfairly prejudicial). First, the court agrees that the fact that Honken was charged with distributing and attempting to manufacture methamphetamine is relevant to the context of Honken's statements to Cutkomp and Cobeen (although the court is less convinced, before evidence is presented, of the relevance of those statements to Johnson's case).

Second, Johnson has not articulated in what way she would be prejudiced if the jury learns the charges to which Honken pleaded guilty in 1997, where she has not been charged with those same offenses.

Therefore, that part of Johnson's December 10, 2004, Motion In Limine Re: Prior Determinations Of Guilt And Punishment Re: Dustin Honken (docket no. 234) pertaining to Honken's conviction in 1997 will be granted as to exclusion of evidence or comment about his sentence for that conviction, but will be denied as to evidence of the specific charges against him.

#### b. Honken's 2004 conviction and verdict for a death sentence

The parties agree that neither Honken's conviction nor the jury verdict for a death sentence in late 2004 in the companion case involving nearly identical charges is admissible in this case. The rule excluding evidence of a co-defendant's guilty plea or conviction on similar charges is " 'founded upon the notion that [such evidence] has only slight probative value on the question of the defendant's guilt, but is extremely prejudicial.' " *United States v. Hutchings,* 751 F.2d 230, 239 (8th Cir.1984) (McMillian, concurring) (quoting *United States v. Miranda,* 593 F.2d 590, 594 (5th Cir.1979)). The court agrees that the rule applies here, because of the significant potential for prejudice that could arise from the possibility that jurors will assume, on the basis of Honken's conviction, that Johnson is guilty of the identical charges. Therefore, such evidence should be excluded in this case. Furthermore, the court agrees that the jury should be instructed that Honken's case is separate from this one; that only Johnson, not anyone else, is on trial in this case; and that Johnson is on trial only for the charges against her, not for anything else.

Therefore, that part of Johnson's December 10, 2004, Motion In Limine Re:

Prior Determinations Of Guilt And Punishment Re: Dustin Honken (docket no. 234) regarding Honken's 2004 conviction and jury verdict for a death sentence will be granted. Evidence of Honken's 2004 conviction and verdict for a death sentence will be excluded and the court will instruct the jury that it must give separate consideration to the charges against Johnson.

### H. The Defendant's Motion For A Bill Of Particulars

The third motion by the defendant now before the court is Johnson's December 23, 2004, Motion For Bill Of Particulars On Counts 1–12 (docket no. 253), to the extent that the motion pertains to the remaining Counts, Counts 1 through 10. The government originally responded to the motion only to the extent that it pertained to Counts 11 and 12, asserting that the motion was moot as to those Counts (docket no. 283). The government subsequently supplemented its response to address the motion as it pertains to Counts 1 through 10 (docket no. 291).

#### 1. Arguments of the parties

In support of her motion, Johnson contends that she is entitled to a particularized statement of the following: (1) as to Counts 1 through 5, identification of all known but unindicted co-conspirators; and (2) as to Counts 6 through 10, identification of all known supervisees, supervisors, managers, and organizers. She notes that she has previously obtained the requested relief as to the original indictment by order dated June 21, 2002, affirming the ruling of United States Magistrate Judge Paul A. Zoss dated November 9, 2001. She requests that these rulings be made applicable to the Counts of the Second Superseding Indictment. Indeed, at the hearing on the "second round" of pretrial motions, Johnson represented that the sole purpose of this motion was to make sure that the court's prior rulings and the bills

of particulars filed pursuant to those rulings still apply to the Second Superseding Indictment.

In response to Johnson's written arguments, the government contended that Johnson's motion for a bill of particulars should be summarily denied. The government asserted that Johnson has already fully litigated the issues presented, and obtained relief, first, by order dated June 21, 2002, to which her motion refers, then again as to the Superseding Indictment by order dated November 26, 2002. The government contended that it provided a bill of particulars as to the Superseding Indictment on December 4, 2002, and that Johnson has never challenged the adequacy of that bill of particulars. The government also contended that no further specification of charges is required for the Second Superseding Indictment, because the Second Superseding Indictment did not materially change Counts 1 through 10, even though it eliminated some of the alleged violations of the narcotics laws and compressed the time of the alleged conspiracy. The government pointed out that Johnson has not identified any part of the Second Superseding Indictment that calls for a bill of particulars. To the extent necessary to clarify matters, the government adopted its previously filed bills of particulars with respect to the Second Superseding Indictment. At the hearing, the government reiterated its adopt its prior bills of particulars.

#### 2. Analysis

The court finds that this motion has been mooted by Johnson's clarification that her goal was to make sure that the prior rulings and bills of particulars apply to the Second Superseding Indictment, and by the government's acknowledgment that its bills of particulars do apply. Thus, Johnson has already obtained all of the

relief for which she prays in this motion. Therefore, to the extent that the motion pertains to the remaining Counts, Counts 1 through 10, the motion will be denied as moot.

## I. The Defendant's Motion To Strike Certain Allegations In Counts 6 Through 10

The next motion before the court is Johnson's December 23, 2004, Motion To Strike Allegations Contained In Counts 6–10 (docket no. 254). This motion seeks an order striking the violations alleged in paragraphs 1, 2, and 4 of Counts 6 through 10. The government resisted the motion on December 30, 2004 (docket no. 262), and Johnson filed a reply in further support of her motion on January 7, 2005 (docket no. 275).

### 1. Arguments of the parties

In support of this motion, Johnson asserts that some of the fifteen paragraphs alleging various violations of the federal narcotics laws, as elements of the CCE offense, fail to allege violations with any specificity sufficient to give notice. More specifically, she alleges that the violations alleged in paragraphs 1, 2, and 4 lack sufficient specificity as to such matters as time, place, or persons involved. She asserts that the insufficiency of these allegations cannot be saved by a bill of particulars.

In response, the government contends that the court has already rejected, by order dated February 23, 2003, Johnson's contentions that these allegations, as stated in the Superseding Indictment, are surplusage, prejudicial, or inflammatory. The government contends that, if anything, the allegation of these violations is more specific in the Second Superseding Indictment, as the dates alleged for the offenses are now "from about [a year] to and including [a year]," instead of "between about [a year] and [a year]."

In her reply, Johnson acknowledges that the court has ruled on a similar motion, but she represents that, for some reason, that ruling was not in defense counsel's pleading file. Nevertheless, she contends that the government has missed the point of her motion: Her point is that the allegations are too vague for her to frame a response, in that they fail to provide necessary detail concerning, for example, the time, place, or persons involved. She is not reiterating her contention that any allegations are surplusage, prejudicial, or inflammatory.

### 2. Analysis

The court agrees that the government's response misses the point of the present motion, because Johnson does not assert that the allegations in paragraphs 1, 2, and 4 of Counts 6 through 10 are surplusage, prejudicial, or inflammatory; rather, she argues that they are too vague for her to frame a response. The court has reviewed the paragraphs in question and finds that they are, indeed, vague, alleging little more than that at places unknown on dates unknown within a six-year period some or all of the alleged participants in the CCE distributed methamphetamine, possessed methamphetamine with intent to distribute it, or used communications facilities to facilitate the commission of drug offenses.

Nevertheless, the court finds that striking the allegations is not an appropriate remedy. Johnson has waived the issues she asserts in the present motion by failing to object to the November 26, 2002, order of Magistrate Judge Paul A. Zoss denying the portion of her request for a bill of particulars seeking specification of the locations, substance, time, place, and date of each overt act in paragraphs 1 through 18 of Counts 6 through 10 of the Superseding Indictment. See Order of November 26, 2002 (docket no. 147). The allegations in paragraphs 1, 2, and 4 of the Second Su-

perseding Indictment have only changed to the extent that allegations of the time-frame of the alleged violations has been stated more specifically. In short, Johnson has litigated the very issue she attempts to resurrect now, lost, and failed to pursue timely review. While the court hopes that the government will voluntarily provide a clearer specification of the challenged violations underlying the CCE offense, based on clarifications from the Honken trial and preparation for trial in this case, the court will not order the government to do so.

Therefore, Johnson's December 23, 2004, Motion To Strike Allegations Contained In Counts 6–10 (docket no. 254) will be denied.

### J. The Defendant's Motion To Trifurcate The Proceedings

In the course of oral arguments, the last motion before the court in this "round," the defendant's January 7, 2005, Motion To Trifurcate Proceedings (docket no. 274), became one of the most contentious. In this motion, Johnson seeks an order "trifurcating" trial into the following phases: (1) a "merits phase" on the elements of the capital offenses; (2) a "gateway phase" on the "gateway factors" for imposition of the death penalty; and (3) a "weighing phase," involving any other aggravating and mitigating factors. The government resisted the motion on January 18, 2005 (docket no. 292).

#### 1. Arguments of the parties
##### a. Written submissions

In her written submissions in support of her motion, Johnson contends that the "penalty phase" of a capital trial such as this one actually has two components that are legally and factually distinct: (1) the determination of certain "gateway" factors, which make the death penalty available; and (2) determination, from weighing of all aggravating and mitigating factors, of

whether the death penalty is an appropriate punishment. Johnson contends, further, that much of the evidence concerning other aggravating factors is not relevant to, and should not be considered by the jury as to, the "gateway" factors. She contends that this is so, in large part, because the evidence concerning other aggravating factors is so emotionally charged that it is unfairly prejudicial as to the "gateway" factors. Johnson next argues that the "gateway" factors are functionally equivalent to "elements" of the offenses, because the death penalty cannot be imposed except upon the finding of one or more of those factors, so that the hearing on "gateway" factors is logically a "trial," not a "sentencing hearing." She asserts that there are differences in relevance and other evidentiary standards between a trial and a sentencing hearing, and that application of the rules of evidence to determination of all "elements" is necessary to assure reliability of the outcome and to maintain the presumption of innocence.

Johnson contends that the only possible remedy for these evils is to bifurcate the "penalty phase" into separate proceedings. The first phase of such proceedings would require the government to prove beyond a reasonable doubt the necessary aggravating factors for imposition of the death penalty. Then, a separate second phase would require a weighing of mitigating factors and aggravating factors

The government characterizes Johnson's argument as an assertion that evidence of non-statutory aggravating factors must not be heard before the jury determines whether the government has proved the "gateway" factors that decide a defendant's "eligibility" for the death penalty. The government, however, contends that the Constitution is not violated when a jury considers both statutory and non-statutory aggravating factors in one proceeding, and that Johnson's proposed "trifurca-

tion" of proceedings is contrary to the scheme authorized in the controlling statute, 21 U.S.C. § 848.

The government points out, first, that under 21 U.S.C. § 848, the government must prove one of the "gateway" aggravating factors listed in 21 U.S.C. § 848(n)(1), then at least one other statutory aggravating factor in 21 U.S.C. § 848(n)(2) through (n)(12), before the defendant is eligible for the death penalty.[15] The government also maintains that it intends to prove several "non-statutory" aggravating factors, including "future dangerousness," "impact on the victims' families," "obstruction of justice," and "the killing of more than one person in a single criminal episode."

The government concedes that the "statutory" aggravating factors can be presumed to be the "functional equivalents of elements," and as such, must be contained in the indictment and found by a jury beyond a reasonable doubt. It does not follow, the government contends, that the jury must find these factors during something called a "trial" versus a "penalty phase" or "sentencing proceeding." Indeed, the government points out that Johnson has cited no authority for the proposition that the proceeding in which the government attempts to prove such "elements" is a "trial" subject to all protections applicable to any trial of a criminal offense. The applicable statute is to the contrary, the government contends, because it provides for proof of all "aggravating factors" after guilt on the underlying crime has been established. What is required to protect the defendant's constitu-

tional rights, the government contends, is the charging of the aggravating factors in the indictment and proof of those factors beyond a reasonable doubt, not "trifurcation" of the proceedings.

Although the government has been unable to find a published decision requiring such "bifurcation" of the "penalty phase," the government points out that the Fourth Circuit Court of Appeals rejected an argument for such a procedure in *Booth–El v. Nuth*, 288 F.3d 571, 582–83 (4th Cir.2002). The government also argues that, in this case, only two of the non-statutory aggravating factors, "future dangerousness" and "victim impact," require additional proof beyond the evidence presented during the "merits phase." Finally, the government contends that any possible confusion about what evidence applies to what factors can be cured by proper limiting instructions from the court.

### b. Oral arguments

The oral arguments on this motion were, to say the least, animated. One point of agreement was nevertheless clear: Both parties agree that, in this case, there will be no additional evidence offered by either party on the "gateway" factors in § 848(n)(1) or the "statutory" aggravating factors in § 848(n)(2) through (12). Rather, the evidence pertaining to these factors will all be presented in the "merits phase." Indeed, the government reiterated that it intends to offer additional proof in the "penalty phase" only on the "non-statutory" aggravating factors of "future dangerousness" and "victim impact." Thus, even if there is a separate "gateway" phase, it will not involve the presentation of any

---

15. The government explains that, at issue here, are the "gateway" factors in § 848(n)(1)(A) ("intentionally killed the victim"), (n)(1)(B) ("intentionally inflicted serious bodily injury which resulted in the death of the victim"), and (n)(1)(C) ("intentionally engaged in conduct intending that the victim be killed or that lethal force be employed

against the victim, which resulted in the death of the victim"), and the "statutory" aggravating factors in § 848(n)(8) ("substantial planning and premeditation"), (n)(9) ("particularly vulnerable victim"), and (n)(12) ("offense committed in an especially heinous, cruel, or depraved manner").

evidence, only argument, instruction, and jury determination on certain factors.

Johnson's theme at the hearing seemed to be that the jury is supposed to recognize the difference between determinations of "guilt" and "punishment," but that combining determination of the "gateway" factors with the other aggravating factors would allow such emotional evidence as victim impact statements and information concerning "future dangerousness" inevitably to "bleed into" the jurors' determination of the "gateway" factors in a prejudicial way. Balanced against the value of "trifurcation" to avoid such prejudice, she contended, the only "downside" is a slightly lengthened process, particularly where, as here, no additional evidence will be offered in support of the "gateway" aggravating factors. The government's themes, on the other hand, were that Johnson's proposal is contrary to the statutory scheme for penalty determination in § 848 and that it would allow defense counsel to obscure from the jury the fact that all of the prior evidence from the "merits phase" of the trial and all of the aggravating factors must be considered in determining the final balance of aggravating and mitigating factors.

The court suggested that Johnson's concerns could be ameliorated by including in the "merits phase" appropriate instructions on the "gateway" aggravating factors and requiring the jury to answer interrogatories in its "merits phase" verdict form concerning the "gateway" aggravating factors, in the event the jury found Johnson guilty. Neither party found this suggestion acceptable. Johnson objected to the court's proposal, because she contended that such a process would obscure the purpose of the "gateway" factors, where determinations of guilt and determinations on the "gateway" factors serve different purposes. She argues that moving from the determination of "guilt" to the determination of "punishment" is such an important step, that the determinations should be made in separate proceedings. The government contended that the court's proposed scheme departed from the statutory "penalty phase" scheme; indeed, the government indicated that it would prefer the defendant's proposed "trifurcation" to combining the determination of "gateway" factors with the determination on the "merits" of the charges against Johnson.[16]

---

**16.** Although neither of the parties here embraced the court's proposal to incorporate determination of the "gateway" factors into the jury's determination of guilt or innocence, a similar scheme is established by statute in Ohio. *See* OHIO REV. CODE ANN § 2929.03(2)(B) (1996) ("If the indictment or count in the indictment charging aggravated murder contains one or more specifications of aggravating circumstances listed in division (A) of section 2929.04 of the Revised Code, the verdict shall separately state whether the accused is found guilty or not guilty of the principal charge and, if guilty of the principal charge, ... whether the offender is guilty or not guilty of each specification. The jury shall be instructed on its duties in this regard. The instruction to the jury shall include an instruction that a specification shall be proved beyond a reasonable doubt in order to support a guilty verdict on the specification, but the instruction shall not mention the penalty that may be the consequence of a guilty or not guilty verdict on any charge or specification."); OHIO REV. CODE ANN. § 2929.03(2)(B) (effective March 23, 2005) (leaving this provision unchanged); *see also* Margery Malkin Koosed, *Averting Mistaken Executions by Adopting the Model Penal Code's Exclusion of Death in the Presence of Lingering Doubt*, 21 N. ILL U.L. REV. 41, 104–08 (2001) (describing the Ohio scheme and explaining, *inter alia*, that "[t]he Ohio legislative framework adopted in 1981 requires that the aggravating circumstances or factors be proven beyond a reasonable doubt at the trial phase of the case").

On a related issue, this very insightful and thoughtful law review article was instrumen-

### c. Post-hearing inquiry

In the course of preparing this ruling, the court determined that it required clarification on one point pertinent to this motion. Therefore, by letter to all counsel dated February 4, 2005, the court requested clarification of whether the defendant proposes that the "second phase" (or "first penalty phase") would be limited to jury determination on the "gateway" aggravating factors identified in 21 U.S.C. § 848(n)(1), or that this "second phase" would also involve jury determination on the "statutory" aggravating factors identified in 21 U.S.C. § 848(n)(2) through (12). The court explained in its letter that the reason for its question was that, like one "gateway" aggravating factor, at least one "statutory" aggravating factor must *also* be found before the death penalty can be imposed. *See* 21 U.S.C. § 848(k). To that extent, a "statutory" aggravating factor, like a "gateway" aggravating factor, is the "functional equivalent of an element," because it is necessary for the imposition of the death penalty under 21 U.S.C. § 848. Moreover, the court explained that it understood the parties' representations to be that no additional evidence would be pre-

sented in this case on *either* the "gateway" or "statutory" aggravating factors at issue, so that only argument would be involved in the "eligibility" phase, if any. The court also explained that it understood the defendant's contention to be that she will be prejudiced if the jury hears "information," not subject to the rules of evidence, that applies only to the "non-statutory" aggravating factors and mitigating factors before the jury makes its determination on the factors necessary for the defendant to be "eligible" for the death penalty. The court opined that this "prejudice" does not arise if the "gateway" and "statutory" aggravating factors are considered in the same "phase," but that such "prejudice" could arise if the proceedings on "statutory" aggravating factors occurred with the proceedings on the "non-statutory" aggravating factors, mitigating factors, and the balance of factors.

In light of these concerns, the court asked the defendant to clarify whether she was advocating one of the following options or something else altogether. The court also asked the government to clarify which of the following options the government found least objectionable:

**Option A:**

| Phase I: "Merits" | Phase II: "Eligibility" | Phase III: "Penalty" |
|---|---|---|
| Determination of guilt or innocence on § 848 offenses | Determination of "gateway" factors identified in § 848(n)(1) (not more than one) | Determination of the appropriate penalty, requiring determination of (a) "statutory" aggravating factors identified in § 848(n)(2) through (12) (one or more), (b) "non-statutory" aggravating factors, |

tal in dispelling the court's "residual doubts" about the correctness of its decision to instruct the jury in Honken's case that "residual doubt" is a mitigating factor that the jury may consider in making its choice between life or death at the "penalty phase." The question of

whether or not to give such a "residual doubt" instruction in this case, however, is a matter that the parties were directed to brief by order dated January 15, 2005, and filed on January 18, 2005 (docket no. 288).

| | | |
|---|---|---|
| | | (c) mitigating factors, and |
| | | (d) the balance of *all* factors to "recommend" life or death sentence |

**Option B:**

| **Phase I: "Merits"** | **Phase II: "Eligibility"** | **Phase III: "Penalty"** |
|---|---|---|
| Determination of guilt or innocence on § 848 offenses | Determination of factors required for the defendant to be "eligible" for the death penalty: <br> (a) "gateway" factors identified in § 848(n)(1) (not more than one); and <br> (b) "statutory" aggravating factors in § 848(n)(2) through (12) (one or more) | Determination of the appropriate penalty, requiring determination of <br> (a) "non-statutory" aggravating factors, <br> (b) mitigating factors, and <br> (c) the balance of *all* factors to "recommend" life or death sentence |

Johnson's counsel responded by e-mail that she was advocating "Option B." In its e-mail response, the government indicated its view that "Option B" makes more sense than "Option A," for the reasons that the court had indicated, although the government could not state an opinion that one option was necessarily any less objectionable than the other.

### 2. *Analysis*

The court notes, first, that 21 U.S.C. § 848 does not specifically provide for the "trifurcated" proceeding that Johnson seeks. Rather, 21 U.S.C. § 848(i) and (j) provide that, after a defendant is found guilty of a death-eligible offense, the penalty will be determined in a separate "sentencing" hearing. In other words, the proceedings are "bifurcated" into what this court has called the "merits" and "penalty" phases, and the "penalty" phase involves determination of *all* aggravating factors and mitigating factors. Therefore, the court must determine whether the Constitution requires the "trifurcation" that Johnson seeks, and if not, whether such "trifurcation" is nevertheless justified on other grounds.

### a. *Constitutional requirements*

▉ The court is not persuaded by Johnson's contention that proceedings that are only "bifurcated" as provided in § 848(j) violate the Supreme Court's *Apprendi* line of cases, because those proceedings do not provide for determination of "gateway" and "statutory" aggravating factors, which must be established before the death penalty can be imposed, *in a "trial."* Rather, the court agrees with the government that what the Supreme Court's *Apprendi* line of cases requires, to satisfy constitutional standards, is that any aggravating factor, without which the death penalty cannot be imposed, must be charged in an indictment and proved to a jury beyond a reasonable doubt. *See United States v. Booker*, —— U.S. ——, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005); *Ring v. Arizona*, 536 U.S. 584, 603–08, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002); *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). This line of cases simply does *not* require that such aggravating factors be proved in a proceeding designated a "trial" as opposed to a "sentencing proceeding" or "penalty phase." *See also Booth–El v. Nuth*, 288 F.3d 571, 582–83 (4th Cir.2002) (rejecting a state prisoner's *habeas* claim that his due

process rights were violated when the trial judge refused to bifurcate the penalty phase, so that the jury would determine whether he was a "first degree principal" in a murder, as required to be eligible for the death penalty, before determining aggravating and mitigating factors, because no clearly established federal law required such bifurcation); *Evans v. Smith,* 54 F.Supp.2d 503, 531 (D.Md.1999) (concluding on *habeas* review of a state capital conviction that the defendant was not entitled to a two-phase sentencing hearing, in which the jury would first determine whether the defendant was a "first degree principal," and only if they so found, consider aggravating and mitigating factors in a second phase, because there was "no constitutional necessity" to bifurcate sentencing, when bifurcation of the merits and penalty phases is not constitutionally required), *aff'd,* 220 F.3d 306 (2000) (not considering the bifurcation issue on appeal); *and compare Williams v. Chrans,* 742 F.Supp. 472, 477 & n. 1 (N.D.Ill.1990) (explaining that ILL. REV. STAT. CH. 38, ¶ 9–1 (1977), provides for a "bifurcated capital sentencing hearing": in the first "eligibility" phase, the government "must prove the existence of at least one of seven aggravating factors beyond a reasonable doubt," and in the second "aggravation/mitigation phase," the state "presents evidence of and argues any aggravating factor and the defendant presents evidence of and argues any mitigating factors"), *aff'd,* 945 F.2d 926 (7th Cir.1991) (not considering the bifurcation issue).

In this case, the government did charge the "gateway" and "statutory" aggravating factors on which it intends to rely in the Second Superseding Indictment. *See* Second Superseding Indictment, "Findings under 21 U.S.C. § 848(n)" (charging "Threshold Culpability Factors Under 21 U.S.C. § 848(n)," alleging conduct satisfying 21 U.S.C. § 848(n)(1)(A), (B), and (C), and "Aggravating Factors Enumerated Under 21 U.S.C. § 848(n)," alleging conduct satisfying 21 U.S.C. § 848(n)(8), (9), and (12)). Furthermore, in this case, as in Honken's case, the court will instruct the jury that one of the "gateway" aggravating factors alleged and at least one of the "statutory" aggravating factors alleged must be proved beyond a reasonable doubt before the defendant is eligible for the death penalty. *See United States v. Honken,* No. CR 01–3047–MWB (N.D.Iowa), Final "Penalty Phase" Jury Instructions Nos. 2 and 3 (docket no. 524).

Nevertheless, the court need not decide whether or not there is a violation of the constitutional requirements identified in the *Apprendi* line of cases in the "penalty phase" proceedings contemplated by 21 U.S.C. § 848, nor address the likelihood of such an *Apprendi* violation in this case. This is so, because the court finds that the "trifurcation" issue can be decided on non-constitutional grounds. *See United States v. Turechek,* 138 F.3d 1226, 1229 (8th Cir. 1998) ("While federal courts are obliged to decide constitutional questions when necessary to the resolution of a dispute before them, 'they have an equally strong duty to avoid constitutional issues that need not be resolved in order to determine the rights of the parties to the case under consideration.' ") (quoting *County Court v. Allen,* 442 U.S. 140, 154, 99 S.Ct. 2213, 60 L.Ed.2d 777 (1979)).

### b. Other grounds for "trifurcation"

**■ i. Statutory limitations on the "information" presented at sentencing.** Although the court finds that the controlling statute, 21 U.S.C. § 848, expressly provides for only a "bifurcated" proceeding—consisting of a "guilt" or "merits" phase and a separate "sentencing" or "penalty" phase—the court nevertheless finds that the "trifurcation" that Johnson seeks is not necessarily inconsistent with the statutory scheme. The controlling

statute permits the jury to consider "information" rather than "evidence" at the sentencing phase of a capital offense. *See* 21 U.S.C. § 848(j) ("information relevant to such mitigating or aggravating factors may be presented by either the Government or the defendant, regardless of its admissibility under the rules governing admission of evidence at criminal trials"). At the same time, it also provides that "information" may be excluded in the "penalty phase" for a § 848 offense "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." 21 U.S.C. § 848(j). This limitation appears to be analogous to the limitation on "evidence" in Rule 403 of the Federal Rules of Evidence, which permits the court to exclude "evidence" that is "relevant," *inter alia*, "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Fed. R. Evid. 403; *see also* Justin D. Flamm, *Due Process on the "Uncharted Seas of Irrelevance": Limiting the Presence of Victim Impact Evidence at Capital Sentencing after Payne v. Tennessee*, 56 Wash. & Lee L. Rev. 295, 310–311 (1999) (noting that the similar evidentiary limitation in the Federal Death Penalty Act, 18 U.S.C. § 3593, is "clearly analogous to Federal Rule of Evidence 403," although § 3593 lacks the word "substantially," suggesting "a lower threshold for exclusion applies at a capital sentencing hearing").[17] Thus, even under this capital sentencing scheme, the court retains at least part of its "gatekeeper" function under Rule 403 to balance probative value of the "information" to be presented against its "danger of unfair prejudice, confusion of the issues, or misleading the jury." *See also United States v. Pretlow*, 779 F.Supp. 758, 770–71 (D.N.J.1991)

(concluding that this evidentiary standard in § 848(j) "is adequate to meet constitutional demands" by preventing the admission of "unreliable" information in a capital sentencing phase). The court will consider whether these limitations justify some form of "trifurcation" of the proceedings, should Johnson be found guilty of a capital offense under 21 U.S.C. § 848.

***ii. "Probative value."*** Section 848(j), like Rule 403, provides that the court may assess the "probative value" of "information" proffered during the sentencing proceedings. Therefore, the court must assess whether there is any "probative value" to considering information concerning "non-statutory" aggravating factors to a jury's determination of "gateway" and "statutory" aggravating factors. The court concludes that there is none.

First, there is no reason to suppose that "probative value" within the meaning of § 848(j) means anything different than "probative value" within the meaning of Rule 403 of the Federal Rules of Evidence. "Probative value" within the meaning of Rule 403, in turn, is essentially the "relevance" of the evidence (or "information"), which is defined in Rule 401 to mean "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401.

In this case, the government has repeatedly stated that it does not intend to present any "information" in the "penalty phase" concerning the "gateway" and "statutory" aggravating factors in addition to what will be presented in the "merits phase." In such circumstances, the information concerning the "non-stat-

---

**17.** The analogy between § 848(j) and Rule 403 is closer than the analogy between § 3593 and Rule 403, because § 848(j) does include the requirement that the probative value be "substantially" outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.

utory" aggravating factors in the "penalty" phase has no probative value to the determination of the "gateway" and "statutory" aggravating factors, because it has no tendency to make any fact that is of consequence to the determination of the "gateway" or "statutory" aggravating factors more probable or less probable than it would be without that information. *Cf.* FED. R. EVID. 401 (so defining "relevance" of "evidence"). Even assuming that there may be *some* "probative value" to the *totality* of the "information" presented in a § 848 sentencing proceeding to the determination of specific "gateway" or "statutory" aggravating factors—an inference that could be drawn from Congress's provision for the hearing of all aggravating and mitigating factors in a single sentencing proceeding—that probative value in this case is extraordinarily weak, where the government concedes that it can prove the "gateway" and "statutory" aggravating factors without any of the "penalty phase" information. The Supreme Court itself has "distinguished between two different aspects of the capital sentencing process, the eligibility phase and the selection phase." *Buchanan v. Angelone,* 522 U.S. 269, 273, 118 S.Ct. 757, 139 L.Ed.2d 702 (1998); *Tuilaepa v. California,* 512 U.S. 967, 971, 114 S.Ct. 2630, 129 L.Ed.2d 750 (1994). Courts and commentators alike have recognized that evidence of "non-statutory" aggravating factors, in particular "victim impact" evidence, while relevant to the "selection" phase, simply is not relevant to the "eligibility" phase. *See, e.g.,* Joshua D. Greenberg, *Is Payne Defensible?: The Constitutionality Of Admitting Victim–Impact Evidence At Capital Sentencing Hearings,* 75 IND. L.J. 1349, 1365–66 & n. 87 (2000) (citing state

cases holding that "victim impact" evidence is irrelevant to the "eligibility" phase of a death sentence determination).[18]

In short, the court finds no substantial reason why the "gateway" and "statutory" aggravating factors must be considered with the "non-statutory" aggravating factors in a single-stage "penalty" proceeding, where the jury's consideration of the "gateway" and "statutory" aggravating factors is entirely severable factually from the jury's consideration of any other factors. Therefore, the "probative value" side of the § 848(j) balance in this case is slight or nonexistent.

***iii. "Prejudice."*** On the other side of the balance, the court finds that there is substantial merit to Johnson's contention that she would be "unfairly prejudiced" if the jury hears evidence of "non-statutory" aggravating factors before the jury decides whether the "gateway" and "statutory" aggravating factors have been proved beyond a reasonable doubt. Again, by analogy to Rule 403, "unfair prejudice" in the context of § 848(j) means having " 'an undue tendency to suggest decision on an improper basis.' " *United States v. Gabe,* 237 F.3d 954, 959–60 (8th Cir.2001) (quoting *United States v. Yellow,* 18 F.3d 1438, 1442 (8th Cir.1994)). The court finds that "information" concerning "non-statutory" aggravating factors has such an "undue tendency" to suggest decision on the "gateway" and "statutory" aggravating factors on an improper basis.

More specifically, I have already presided over the "penalty phase" in the companion case against Dustin Honken. This case will likely involve "victim impact" evi-

---

**18.** Useful discussions of the use and effect of victim impact evidence in death penalty cases can be found in the Cornell Law Review's 2003 *Symposium—Victims and the Death Penalty: Inside and Outside the Courtroom,* 88 CORNELL L. REV. (2003), and the Stanford Law and Policy Review's 2004 *Symposium—Capital Concerns: The Death Penalty in America,* 15 STAN. L. & POL'Y REV. (2004).

dence that is substantially similar to the "victim impact" evidence in Honken's case, because this case involves the same alleged murders of the same victims. I can say, without hesitation, that the "victim impact" testimony presented in Honken's trial was the most forceful, emotionally powerful, and emotionally draining evidence that I have heard in any kind of proceeding in any case, civil or criminal, in my entire career as a practicing trial attorney and federal judge spanning nearly 30 years. Indeed, I cannot help but wonder if *Payne v. Tennessee,* 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), which held that victim impact evidence is legitimate information for a jury to hear to determine the proper punishment for capital murder, would have been decided the same way if the Supreme Court Justices in the majority had ever sat as trial court judges in a federal death penalty case and had observed first hand, rather than through review of a cold record, the unsurpassed emotional power of victim impact testimony on a jury. It has now been over four months since I heard this testimony in the *Honken* trial and the juror's sobbing during the victim impact testimony still rings in my ears. This is true even though the federal prosecutors in *Honken* used admirable restraint in terms of the scope, amount, and length of victim impact testimony. To pretend that such evidence is not potentially unfairly prejudicial on issues to which it has little or no probative value is simply not realistic, even if the court were to give a careful limiting instruction. Rather, such potent, emotional evidence is a quintessential example of information likely to cause a jury to make a determination on an unrelated issue on the improper basis of inflamed emotion and bias—sympathetic or antipathetic, depending on whether one is considering the defendant or the victims' families. *Cf. Gabe,* 237 F.3d at 959–60 (defining "unfair prejudice" for purposes of Rule 403 as " 'an

undue tendency to suggest decision on an improper basis' ").

Nor are my observations idiosyncratic. *See, e.g., Payne,* 501 U.S. at 825, 111 S.Ct. 2597 (although victim impact evidence is legitimate information for a jury to hear to determine the proper punishment for capital murder, such evidence may nevertheless be "so unduly prejudicial that it renders the trial fundamentally unfair," in which circumstances, the Due Process Clause provides a remedy); *id.* at 864, 111 S.Ct. 2597 (Stevens, J., dissenting) ("Irrelevant victim impact evidence that distracts the sentencer from the proper focus of sentencing and encourages reliance on emotion and other arbitrary factors necessarily prejudices the defendant."); *South Carolina v. Gathers,* 490 U.S. 805, 810–811, 109 S.Ct. 2207, 104 L.Ed.2d 876 (1989) (reiterating the conclusion in *Booth, infra,* concerning the prejudicial effect of victim impact evidence and rejecting the contention that the specific victim impact evidence at issue related to the circumstances of the crime), *overruled by Payne v. Tennessee,* 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991); *Booth v. Maryland,* 482 U.S. 496, 505–07, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987) (concluding that "[a]llowing the jury to rely on [victim impact information] ... could result in imposing the death sentence because of factors about which the defendant was unaware, and that were irrelevant to the decision to kill," and that "[t]he prospect of a 'mini-trial' on the victim's character is more than simply unappealing; it could well distract the sentencing jury from its constitutionally required task—determining whether the death penalty is appropriate in light of the background and record of the accused and the particular circumstances of the crime"), *overruled by Payne v. Tennessee,* 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991); *see also, e.g.,* Bryan Myers & Edith Greene, *The Prejudicial Nature of Victim Impact Statements,* 10 Psychol.

PUB. POL'Y & L. 492 (2004) (exploring the extent to which victim impact statements are prejudicial to death sentence determinations); Niru Shanker, *Getting a Grip on Payne and Restricting the Influence of Victim Impact Statements in Capital Sentencing: The Timothy McVeigh Case and Various State Approaches Compared,* 26 HASTINGS CONST. L.Q. 711, 740 (1999) ("Thanks in part to poorly articulated parameters in *Payne [v. Tennessee,* 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991) ], victim impact testimony in capital sentencing walks a fine line between allowing particularized attention to the damage caused by the crime on the one hand, and leaving the jury to be inundated with prejudicial outpourings irrelevant to the defendant's guilt on the other."); Wayne A. Logan, *Through the Past Darkly: A Survey of the Uses and Abuses of Victim Impact Evidence in Capital Trials,* 41 ARIZ. L. REV. 143, 145 (1999) ("The state of the law seven years since *Payne* establishes ... [that] many of the worst fears imagined in the wake of *Payne* have been realized. Highly prejudicial victim impact

evidence is now routinely before capital juries, with precious little in the way of substantive limits, procedural controls, or guidance in how it is to be used in assessing the 'deathworthiness' of defendants."); Amy K. Phillips, *Thou Shalt Not Kill Any Nice People: The Problem of Victim Impact Statements in Capital Sentencing,* 35 AM. CRIM. L. REV. 93, 101–113 (1997) (arguing that capital juries have a tendency to consider improper factors in sentencing, even in the absence of victim impact statements, so that victim impact statements exaggerate the extent to which improper factors influence capital sentencings).

Therefore, as a general matter—and certainly in this case—the danger of unfair prejudice arising from hearing "victim impact" evidence or evidence on other "nonstatutory" aggravating factors before the jury makes its determination on the defendant's "eligibility" for the death penalty, on the basis of the "gateway" and "statutory" aggravating factors, substantially outweighs any probative value of such evidence to the determination of the defendant's "eligibility" for a death sentence.[19]

**19.** The court by no means suggests that "victim impact" evidence is irrelevant to the jury's *selection* of the appropriate penalty in a particular capital case, because the impact of a crime on the victims is, *inter alia,* an appropriate measure of the defendant's "blameworthiness." *See, e.g., Jones v. United States,* 527 U.S. 373, 401–02, 119 S.Ct. 2090, 144 L.Ed.2d 370 (1999) ("Even though the *concepts* of victim impact and victim vulnerability may well be relevant in every case, *evidence* of victim vulnerability and victim impact in a particular case is inherently individualized. And such evidence is surely relevant to the selection phase decision, given that the sentencer should consider all of the circumstances of the crime in deciding whether to impose the death penalty.") (citing *Tuilaepa v. California,* 512 U.S. 967, 976, 114 S.Ct. 2630, 129 L.Ed.2d 750 (1994)) (emphasis in the original); *Payne v. Tennessee,* 501 U.S. 808, 825, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991) ("We are now of the view that a State may properly conclude that for the jury to assess

meaningfully the defendant's moral culpability and blameworthiness, it should have before it at the sentencing phase evidence of the specific harm caused by the defendant."); *id.* at 827, 111 S.Ct. 2597 ("We thus hold that if the State chooses to permit the admission of victim impact evidence and prosecutorial argument on that subject, the Eighth Amendment erects no per se bar. A State may legitimately conclude that evidence about the victim and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed. There is no reason to treat such evidence differently than other relevant evidence is treated."). Therefore, nothing the court says here should be taken as suggesting that the court will otherwise limit the admissibility of "victim impact" information or information of other "non-statutory" aggravating factors in the proper context of penalty selection—at least not without a further assessment of whether, *in that context,* the probative value of the information is sub-

On the other hand, there is no potential for unfair prejudice if the jury hears argument and makes a determination on the "gateway" and "statutory" aggravating factors in one proceeding. First, no "information" in addition to what will already have been presented in the "merits phase" in this case will be presented in support of either kind of aggravating factor. Second, as the court noted above, the "gateway" and "statutory" aggravating factors have the same constitutional status under the *Apprendi* line of cases, in that the jury must find beyond a reasonable doubt one "gateway" factor and at least one "statutory" aggravating factor before Johnson is eligible for the death penalty. *See* 21 U.S.C. § 848(k).

Therefore, the court finds that Johnson has established one ground for excluding information from the "penalty" phase under § 848(j), "danger of unfair prejudice," as to consideration of "non-statutory" aggravating factors in the same proceeding as consideration of "gateway" and "statutory" aggravating factors. The court will consider the cure for such unfair prejudice below, after considering whether Johnson has established other statutory limitations on the "information" that can be presented in the "penalty phase" in this case.

*iv. "Confusion of the issues."* The court likewise concludes that the "confusion of the issues" ground for exclusion of information under § 848(j) also warrants exclusion of information concerning any other factors from the proceedings relating to the "gateway" and "statutory" aggravating factors in this case. *See* 21 U.S.C. § 848(j) (also permitting exclusion of information when its probative value is substantially outweighed by the potential for "confusion of the issues"). Again, in this case, the information concerning "gateway" and

"statutory" aggravating factors is entirely severable from information concerning any other factor, where the government intends to rely only on evidence admitted in the "merits phase" to prove the "gateway" and "statutory" aggravating factors. Introduction of extraneous information into the jury's determination of the "gateway" and "statutory" aggravating factors could, thus, only tend to confuse the issues.

*v. "Misleading the jury."* Finally, the court finds that the "misleading the jury" ground for exclusion of information under § 848(j) also warrants exclusion of information concerning any other factors from the proceedings relating to the "gateway" and "statutory" aggravating factors in this case. *See* 21 U.S.C. § 848(j) (also permitting exclusion of information when its probative value is substantially outweighed by the potential for "misleading the jury"). If the jury is permitted to hear information on *all* of the factors in one proceeding, the jury is reasonably likely to be misled into believing that *all* information is pertinent to the determination of *all* factors and the balance of factors, when the process under § 848 is actually sequential and cumulative: The jury must first find the defendant guilty; then must find one "gateway" aggravating factor; then must find at least one "statutory" aggravating factor; then *may* find one or more "non-statutory" aggravating factors and one or more mitigating factors; then must balance *all* of the factors to determine the appropriate penalty. *See* 21 U.S.C. § 848(k).

The government, however, complains that separating the proceedings concerning the "gateway" and "statutory" aggravating factors from the proceedings concerning the other factors and the balance of the factors may allow the defense to

---

stantially outweighed by the danger of unfair prejudice, confusion of the issues, or mislead-

ing the jury.

mislead the jury into believing that its previous determinations on the "merits" and the "gateway" and "statutory" aggravating factors somehow become irrelevant to the final balancing. However, the cure for that potential problem is twofold: (1) The court must give proper instructions, which explain, *inter alia,* that all of the information is relevant to the final balancing of factors; and (2) the prosecution must engage in effective advocacy to direct the jury to a consideration of appropriate factors at the appropriate times.

Therefore, the court finds that Johnson has also established this "danger of misleading the jury" ground for excluding information from the "penalty" phase under § 848(j) as to consideration of "non-statutory" aggravating factors in the same proceeding as consideration of "gateway" and "statutory" aggravating factors.

#### c. The remedy

The cure for the potential unfair prejudice, confusion, and misdirection in this case, the court finds, is to restructure when the jury is instructed and when it makes its determinations on the various aggravating and mitigating factors. In *United States v. Davis,* 912 F.Supp. 938 (E.D.La.1996), the only published decision either the court or the parties have been able to identify considering a similar question, the court declared its intention to use the following process to avoid improper exposure to unrelated information at inappropriate times:

> [I]f the penalty phase is reached in this case, the court is considering bifurcating the hearing into two parts. The first part would focus exclusively on the two findings the jury must make in order to consider the death penalty— whether the intent element was established and whether at least one statutory aggravating factor was proven. This phase of the penalty hearing presumably would rely almost entirely upon the evidence already presented in the guilt phase and involve little, if any, additional information. It would nonetheless insure that the jury's findings as to intent and the statutory factors would not be influenced by exposure to the separate and unrelated nonstatutory factors and information. Should the jury make the two requisite threshold findings, the hearing would then continue into the presentation of the nonstatutory aggravating and mitigating information.

*Davis,* 912 F.Supp. at 949. The court agrees that a similar procedure will cure the potential prejudice, confusion, and misdirection problems, described above, in this case.

Specifically, this court will use "trifurcated" proceedings conforming to what the court and the parties have described as "Option B," which the court summarized as follows:

| Phase I: "Merits" | Phase II: "Eligibility" | Phase III: "Penalty" |
|---|---|---|
| Determination of guilt or innocence on § 848 offenses | Determination of factors required for the defendant to be "eligible" for the death penalty: (a) "gateway" factors identified in § 848(n)(1) (not more than one); and (b) "statutory" aggravating | Determination of the appropriate penalty, requiring determination of (a) "non-statutory" aggravating factors, (b) mitigating factors, and (c) the balance of *all* factors to "recommend" life or death |

factors in § 848(n)(2) sentence
through (12) (one or more)

In other words, if the defendant is found guilty in the first phase of the trifurcated proceedings, the "merits phase," this case will enter the second phase. That phase, an "eligibility phase," will involve only argument, instruction, and deliberation on the "gateway" factors identified in § 848(n)(1) and the "statutory" aggravating factors in § 848(n)(2) through (12) that the government has identified as applicable here, because the government has represented that no additional evidence will be presented in this case on these factors. If the jury fails to find any "gateway" factor or fails to find at least one "statutory" aggravating factor for a charged offense on which Johnson has been found guilty, there will be no "penalty phase" to determine "non-statutory" and "mitigating" factors for that offense or to determine the balance of such factors, and the death penalty cannot be imposed for that offense. However, if the jury finds one "gateway" factor and at least one "statutory" aggravating factor beyond a reasonable doubt as to one or more capital offenses charged against Johnson, Johnson is "eligible" for the death penalty. Therefore, the case will continue with the third phase, the "penalty phase," in which the jury will consider the existence of "non-statutory" and "mitigating" factors and "whether the aggravating factors found to exist sufficiently outweigh any mitigating factor or factors found to exist, or in the absence of mitigating factors, whether the aggravating factors are themselves sufficient to justify a sentence of death." 21 U.S.C. § 848(k).

Therefore, notwithstanding that § 848 expressly provides for a "bifurcated" proceeding, the court concludes that § 848(j) permits, and the circumstances in this case require, that the proceedings in the case be "trifurcated," as described above. To that extent, Johnson's January 7, 2005, Motion To Trifurcate Proceedings (docket no. 274) will be granted.

### III. CONCLUSION

At the end of another long and arduous journey, after again treading both familiar terrain and terra incognita, the motions filed on or before January 7, 2005, and heard on January 27, 2005, in docket number order, are resolved as follows:

1. The defendant's December 8, 2004, Motion To Strike Death Penalty (docket no. 230) is **denied.**

2. The defendant's December 10, 2004, Motion In Limine Re: Prior Determinations Of Guilt And Punishment Re: Dustin Honken (docket no. 234) is

 a. **granted** to the extent that it seeks exclusion of evidence or comment about Dustin Honken's sentence for his 1997 conviction, but will be denied as to evidence of the specific charges against him in that case; and

 b. **granted** to the extent that evidence of Honken's 2004 conviction and death sentence will be excluded and the court will instruct the jury that it must give separate consideration to the charges against Johnson.

3. The defendant's December 23, 2004, Motion For Bill Of Particulars On Counts 1–12 (docket no. 253), to the extent that the motion pertains to the remaining Counts, Counts 1 through 10, is **denied as moot.**

4. The defendant's December 23, 2004, Motion To Strike Allegations Contained In Counts 6–10 (docket no. 254) is **denied.**

5. The government's December 29, 2004, Motion To Permit Victim Witnesses To Observe The Guilt Phase Of Trial

(docket no. 258), as supplemented on January 16, 2005 (docket no. 285), is **granted.**

6. The government's December 29, 2004, Motion For Use Of Witness Photographs During Arguments (docket no. 259) is **granted** on the following conditions:

a. A court employee will take a photograph of each witness, as the witness appeared while testifying, either before the witness's testimony has begun (as part of the "swearing in" process) or after the witness's testimony has concluded (as part of the process of dismissing the witness);

b. The photographs will be printed and compiled in a notebook;

c. Either party may use the photographs of witnesses in the course of their arguments at the conclusion of any phase of the trial to refresh jurors' memories about the testimony of any witness or group of related witnesses;

d. No party will be permitted to display more than one witness's photograph at any given time, unless that party has previously requested permission of the court to display simultaneously the photographs of a group of witnesses who testified on related matters and has shown the proposed display to opposing counsel;

e. No party may display all of the witnesses' photographs in a single display without prior permission of the court and may only present such a display for a limited period of time, not for the full duration of a closing argument; and

f. Unless a sufficient contrary showing is made upon the conclusion of all evidence in the "merits phase" of the trial, the notebook will be sent to the jury for the jury's use during deliberations.

7. Ruling is **reserved** on the government's December 29, 2004, Motion For Pretrial Ruling Regarding Admissibility Of Audio Recordings (docket no. 260). The admissibility of the audio recordings in question must be determined at trial. If sufficient foundation is laid, the recordings may be conditionally admitted pursuant to the "co-conspirator" and/or "forfeiture by wrongdoing" hearsay exceptions.

8. The government's December 30, 2004, Motion For Equal Number Of Peremptory Challenges And Request For Pretrial Ruling (docket no. 261) is **granted** to the extent that, if the court determines that pretrial publicity or other considerations warrant granting additional peremptory challenges beyond those expressly authorized by Rule 20(b), the court will grant both parties the same number of additional peremptory challenges.

9. The government's January 6, 2005, Motion For A Court Ordered Mental Examination Of Defendant, And Related Matters (docket no. 270) is

a. **granted** to the extent that **on or before February 25, 2005,** defendant shall supplement her notice of intent to present evidence of mental condition pursuant to Rule 12.2(b) to include the kinds of mental health professionals each of her experts is (e.g., "forensic psychiatrist", "neurologist", "clinical psychologist", etc.), as well as the specific nature of any testing that these experts have performed or will perform (e.g., MMPI–2, WAIS–2, etc.) in the course of their evaluation of Ms. Johnson;

b. **granted** to the extent that the government's deadline to respond to Johnson's notice is **extended to and including March 11, 2005.**

c. **granted** to the extent that the court **orders and directs** defendant Angela Johnson to submit to mental examinations, evaluations, or interviews by government mental health experts pursuant to Rule 12.2(c)(1)(B), subject to the following conditions and procedures:

i. By separate order, the court will appoint an "outside taint attorney" or "outside taint attorneys" to manage the government's mental health experts in this case;

ii. No "outside taint attorney" shall participate in the prosecution of Johnson at any stage of these proceedings;

iii. The "outside taint attorneys" shall provide Johnson's defense counsel with at least five days advance notice of any mental examinations or interviews of Johnson by the government's experts, including the "nature and scope" of such examinations or interviews;

iv. All testing or interviews conducted by the government's mental health experts pursuant to Rule 12.2(c)(1)(B) shall be audiotaped in their entirety and those tapes shall be provided to defense counsel by same-day or next-day delivery upon the conclusion of each testing or interview session. The recordings shall not be disclosed to the prosecutors in this case until and unless disclosures pursuant to Rule 12.2(c)(2) become appropriate.

d. The results of any mental examinations, evaluations, or interviews shall be subject to the limitations on disclosure and use stated in Rule 12.2(c)(2), (3), and (4).

10. The defendant's January 7, 2005, Motion To Trifurcate Proceedings (docket no. 274) is **granted** to the extent that the "merits phase" and "penalty phase" proceedings will be modified as explained herein.

**IT IS SO ORDERED.**